UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARBARA JEAN MERCER,

      Petitioner,                                   Case No. 16-cv-11331
                                                     Hon. Matthew F. Leitman

v.

ANTHONY STEWART, *Warden*,

      Respondent.

_____/

**<u>OPINION AND ORDER (1) DETERMINING THAT PETITIONER
IS ENTITLED TO HABEAS RELIEF ON DUE PROCESS CLAIM
RELATED TO THE DENIAL OF A DEFENSE OF OTHERS
JURY INSTRUCTION; (2) ORDERING SUPPLEMENTAL
BRIEFING ON THE FORM AND SCOPE OF HABEAS RELIEF
ON DUE PROCESS CLAIM; (3) DENYING HABEAS RELIEF ON
ALL OTHER CLAIMS; AND (4) GRANTING A LIMITED
CERTIFICATE OF APPEALABILITY</u>**

In 2011, Petitioner Barbara Jean Mercer, who was then in the throes of a crippling addiction to crack cocaine, made two grave mistakes that sent her and those around her down a dangerous path. Her first mistake was stealing a small amount of crack from two violent drug dealers, Anthony Hannah and Shemel Thomas. Thomas quickly discovered the theft, and he then threatened to "shoot [Mercer's] shit up" and "hurt" her. Mercer was frightened by Thomas' threats. She told her live-in boyfriend, Richard Janish, about them, and he was "terrified." Mercer then made her second mistake. She developed a risky plan with Janish to end the threats

from Thomas and Hannah.  In Mercer's words, she agreed with Janish that they would (1) "call [Hannah and Thomas] over [to Mercer's house]" with a promise of payment for the stolen crack and then, (2) when Hannah and Thomas arrived, Janish would "scare them a little bit" in an effort to persuade them to stay away from Mercer.  This ill-conceived scheme ended with Thomas and Hannah shot to death at Mercer's house.

During the police investigation into the shootings, Janish and Mercer explained to investigators how their plan to scare off Thomas and Hannah went awry.  Janish told officers that shortly after Thomas and Hannah arrived at Mercer's residence, he (Janish) had a confrontation with Hannah in front of the house and ended up having to shoot Hannah in an effort to defend himself.  Janish and Mercer both told investigators that Janish then entered the house and found Thomas attempting to sexually assault Mercer.  They explained that Janish shot Thomas in order to defend Mercer against the assault.

The local prosecuting attorney did not believe Mercer's and Janish's account of the killings.  He concluded that Mercer and Janish had conspired to kill Hannah and Thomas long before they arrived at Mercer's house to collect the drug debt.  The prosecutor charged Mercer and Janish with, among other crimes, one count of conspiracy to commit first-degree murder, and two counts of pre-meditated first-degree murder.  At trial, the jury was also permitted to consider charges of second-

degree murder and manslaughter because those offenses were lesser-included offenses of the first-degree murder charges.

During the trial, the parties primarily clashed over whether Mercer and Janish planned the killings and whether they were guilty of conspiracy and first-degree murder.  Mercer and Janish prevailed in that battle.  The jury acquitted them of the conspiracy and first-degree murder charges.

Mercer and Janish also had a complete defense to the second-degree murder and manslaughter charges with respect to Thomas' death, but the state trial court prevented the jury from considering that defense.  Under Michigan law, neither Mercer nor Janish could have been convicted of any homicide offense with respect to the killing of Thomas if the jury found, as they both told police, that Janish killed Thomas to prevent him from raping Mercer (the "Defense of Mercer Defense"). However, the state trial court refused to instruct the jury on the Defense of Mercer Defense.  That refusal prejudiced Mercer in two significant ways.  First, it freed the prosecution from the heavy burden of having to prove beyond a reasonable doubt that Janish did *not* kill Thomas to stop him from sexually assaulting Mercer.  Second, it deprived Mercer of her only viable complete defense to the second-degree murder and manslaughter charges related to Thomas' death.  Without the instruction in question, the jury convicted Mercer of the second-degree murder of Thomas.

The Michigan Court of Appeals affirmed that conviction.  That court rejected the claim by Mercer that the state trial court violated her due process rights to present a defense when it refused to instruct the jury on the Defense of Mercer Defense.  The appellate court held that the state trial court properly withheld that instruction because there was "no evidence" that Janish killed Thomas to protect Mercer from being raped.  That ruling was based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).  The statements that Mercer and Janish gave to investigators plainly constituted evidence that Janish shot Thomas to stop him from sexually assaulting Mercer.  Indeed, Respondent has acknowledged as much.

In these habeas proceedings, Mercer again claims, among other things, that the failure to instruct the jury on the Defense of Mercer Defense with respect to the killing of Thomas violated her due process right to present a defense.  Because the Michigan Court of Appeals' rejection of that claim was based upon an unreasonable determination of the facts, the Court reviews the claim *de novo*.  For the reasons explained below, and on *de novo* review, the Court concludes that Mercer is entitled to habeas relief on her due process claim.  As further explained below, the Court directs the parties to file supplemental briefs addressing the form and scope of relief on that claim.  Finally, the Court concludes that Mercer is not entitled to habeas relief on her other claims for relief.

# I

# A

In late October 2011, Mercer lived in a house with Janish, her young son, and her friend Jessica Campbell. (*See* 6/12/2012 Tr., ECF No. 7-7, PageID.851–854.) Mercer and Campbell were both unemployed (*see* 6/13/2012 Tr., ECF No. 7-8, PageID.950) and addicted to crack cocaine. (*See* 6/12/2012 Tr., ECF No. 7-7, PageID.865.)

On October 29, 2011, Mercer and Campbell decided to obtain and smoke crack cocaine, as they had done every day that week. (*See id.*, PageID.866.) Mercer attempted to contact Hannah, a drug dealer from whom she had previously purchased crack. (*See id.*, PageID.868.) Hannah was unavailable, so Mercer instead spoke with his partner, Thomas. (*See id.*, PageID.867–868.) Mercer arranged to purchase $150 worth of crack from Thomas. (*See id.*, PageID.867.) Mercer told Thomas that she would place $150 in cash inside a DVD case and would deliver a bag of DVD cases to him in exchange for the crack. (*See id.*)

Mercer then met Thomas at his house, gave him a bag of DVD cases, and drove away with the crack cocaine. (*See id.*) But Mercer had not placed $150 cash in the DVD cases as she told Thomas she would. Instead, she had given Thomas a bag of empty DVD cases with no money inside them. (*See* 6/13/2012 Tr., ECF No.

7-8, PageID.931.)  Simply put, she had stolen $150 worth of crack cocaine from Thomas.

Mercer and Campbell drove home and smoked the crack cocaine. (*See* 6/12/2012 Tr., ECF No. 7-7, PageID.871.)  Around that same time, Thomas noticed that Mercer had cheated him out of $150.  Shortly thereafter, Thomas sent a series of threatening text messages to Mercer demanding that Mercer pay the money she owed him:

> I'm going to shoot your shit up. I got you bitch. I don't play like that. I got you.
>
> * * *
>
> [Y]ou fucking call me on some bullshit and then let me know where you live. Are you fucking nuts. I'm a hood nigger. Don't play with me. That will get you hurt. I want my money. I should have look -- I'm going to let my bro know. He is not going to be happy. I thought you was real. I know you one thing, you better have my money in the morn -- in the a.m.

(6/13/2012 Tr., ECF No. 7-8, PageID.989–990.)

Campbell would testify later that Mercer was either "paranoid" about, or "terrorized" by, Thomas' threatening texts. (*Id.*, PageID.939.)[1] A few hours later, Mercer told Janish about Thomas' threats, and he too was "terrified." (*Id.*, PageID.951.) Mercer and Janish had good reason to be fearful: Both Thomas and Hannah were "mid to upper level drug dealers" with "a violent criminal history." (*Id.*, PageID.1171, 1185.) Indeed, the local police regarded Thomas and Hannah as "dangerous men." (*Id.*, PageID.1173.)

Early on the morning of October 31, 2011, Mercer responded to Thomas' threatening texts by claiming that the $150 had been stolen from the DVD cases before she gave them to Thomas. (*See id.*, PageID.989–990.) She promised Thomas that she would pay him back and asked that he stop threatening her:

> I'll have it for you. So stop tripping please. I have kids in this house and I ain't dumb to pull shit like that. My kid's safety comes first to me.

(*Id.*, PageID.990.)

---

[1] At the pre-trial preliminary examination in this case, Campbell testified that Mercer "was terrified of" and "terrorized" by Thomas' threats. (12/5/2011 Hr'g Tr., ECF No. 7-2 PageID.373, 389.) Campbell appeared to temporarily walk back this testimony on direct examination at trial. In response to a question from the prosecutor, she denied that Mercer was "nervous" about Thomas' threats. (6/12/2012 Tr., ECF No. 7-7, PageID.875.) However, on cross examination, Campbell conceded that, at a minimum, Mercer was "paranoid," and was *not* "nonchalant," about Thomas' threats. (6/13/2012 Tr., ECF No. 7-8, PageID.938–939, 947.) Campbell added that she, personally, feared that Thomas and Hannah would shoot up Mercer's house and that this fear was "well founded." (*Id.*, PageID.946.)

7

Thomas responded by demanding his money again.  But he backtracked a bit from his earlier threats.  His texts read, in part:

> [D]og just have my shit, real talk.
>
> * * *
>
> [W]hen are you – when are you going to have my cash?
> I'm not going to do shit. I must have my money.

(*Id.*, PageID.991.)

On the evening of October 31, 2011, Mercer called Hannah to invite him and Thomas to her house. (*See id.*, PageID.1109.)  What happened next that night is hotly contested and was the focal point of Mercer's trial.  Details concerning Janish's and Mercer's versions of events and concerning the prosecution's competing version are provided in depth below.  However, it is uncontested that later that night, law enforcement officers discovered Thomas' and Hannah's car abandoned and burned near a nature preserve, with Thomas and Hannah, both dead from gunshot wounds, inside. (*See* 6/12/2012 Tr., ECF No. 7-7, PageID.770.)

**B**

Shortly after officers discovered the bodies, they focused their investigation on Mercer and Janish.  Both were brought in for questioning on November 3, 2011. (*See* 6/13/2012 Tr., ECF No. 7-8, PageID.998.)  Police investigators interviewed

Mercer first, then Janish, and then Mercer again.  Their interviews were recorded and later played for the jury at trial.[2]

In Mercer's first interview with investigators, she initially denied knowing Thomas and Hannah. (*See id.*, PageID.1009.)  As the questioning continued, she eventually admitted that she knew them and that she had called them on the evening of October 31, 2011. (*See id.*, PageID.1041.)  She said that she told them during the call that Janish had gathered money to pay the $150 debt and that they could come to her house to pick up the cash. (*See id.*)

Mercer then explained to the investigators that when Thomas arrived, he attempted to sexually assault her, and Janish shot Thomas in an effort to prevent that assault:

> And they – [Thomas] just knocked on my door and I opened it and that's when he had pushed me down and tried to rape me and then [Janish] came out of the room and [Janish] had told [Thomas] to get off of me, and [Thomas] didn't at first, and then [Janish] put the gun to [Thomas'] head and – (inaudible). And then [Janish] had shot [Thomas] and I had went into the bathroom. I was petrified. I didn't know what to do. I was stunned at that point in time –

(*Id.*, PageID.1041.)  Later in the interview, she added that Thomas "helped himself in" to the room in which she had been located and "pushed [her] down." (*Id.*,

---

[2] The recordings were of poor quality with myriad references to "undecipherable" statements on the transcripts.

PageID.1049.)  She said that at that point, Janish "came in there, he told [Thomas] to get off [Mercer].  [Thomas] didn't at first until he felt the barrel of the gun and he stood up and [Janish] shot him." (*Id.*, PageID.1049–1050.)  Mercer said that Thomas was "on top of" her when Janish shot him. (*Id.*, PageID.1029.)

In addition, Mercer denied that the killings of Thomas and Hannah were "a set up." (*Id.*, PageID.1061.)  She said that, instead, the plan was "[t]hat [Janish] was just going to scare [Thomas and Hannah when they arrived], that's all." (*Id.*, PageID.1057.)

Investigators next interviewed Janish. (*See id.*, PageID.1000.)  Like Mercer, Janish initially denied having any connection to Thomas and Hannah. (*See id.*, PageID.1086.)  He later acknowledged, however, that on October 31, 2011, Mercer called Hannah and invited him and Thomas to Mercer's house in order "to put an end to what she was doing" – meaning, in his estimation, to put an end to her using crack cocaine. (*Id.*, PageID.1096, 1109.)  Janish said that shortly after Thomas and Hannah arrived, he (Janish) confronted Hannah as Hannah sat in his (Hannah's) parked car in the driveway. (*See id.*, PageID.1097–1098.)  Janish said that he told Hannah to "get the fuck out of" there. (*Id*., PageID.1098.)  According to Janish, the two then had an altercation during which Hannah "got out of the passenger side [and] took a swing at [Janish] and [Janish] took a swing back." (*Id.*)  Janish thereafter shot Hannah. (*See id.*, PageID.1098–1099.)

10

Janish then went back into the house. (*See id.*, PageID.1099.)  He said that when he entered the house, he saw that Thomas had "tried to grab a hold of" Mercer, "pushed [her] down on the bed," and that Thomas was "[t]rying to have sex with her." (*Id.*)  Janish said this "[f]reaked [him] out." (*Id.*)  He said he then "told [Thomas] to get off her, to leave her alone." (6/14/2012 Tr., ECF No. 7-9, PageID.1205.)  Janish said that Thomas did not get off Mercer and that he (Janish) then shot Thomas. (*Id.*)

After investigators finished questioning Janish, they re-interviewed Mercer. (*See* 6/13/2012 Tr., ECF No. 7-8, PageID.1117.)  They confronted her with Janish's statement and suggested that Janish had provided details that she had omitted. (*See id.*, PageID.1118.)  They then pressed Mercer on her story that Janish had shot Thomas because he (Thomas) was attempting to rape her.  They questioned whether she was in fact planning to have consensual sex with Thomas – perhaps to settle her drug debt.  She admitted that she had previously had sex with Hannah – but not Thomas – on a prior occasion. (*See id.*, PageID.1120.)  She also admitted that when Thomas came inside the house, she "had lingerie" on underneath her clothes and that she was "going to" take off her pants. (*Id.*, PageID.1119–1120.)  But she denied that she consented to have sex with Thomas. (*See id.*, PageID.1120.)  She also stuck to her story that Thomas had pushed her onto her bed just before Janish shot him.

11

However, she now said that Thomas had not pushed her in an aggressive way.  The

relevant portion of Mercer's second interview was as follows:

> UNIDENTIFIED SPEAKER: [Thomas] didn't come in to rape you, he came in to have sex with you?
>
> MS. MERCER: No, he had come in there and I'm guessing that – (undecipherable) – with him, but I did not verbally or in any aspect say just come in and have sex with me. Like I said, I've had sex with [Hannah] one time and that was way prior to the – this.
>
> UNIDENTIFIED SPEAKER: Now, [Janish] tells us he actually shot Ant first in the driveway. Did you hear a gunshot in the driveway?
>
> MS. MERCER: Um, I didn't hear. When he had come in him and I were conversating, as we were talking, and I had bent down and when I came up he said, just a second, I forgot something, and I went to move this way and then that's when Ricky had come in and – (undecipherable).
>
> * * *
>
> UNIDENTIFIED SPEAKER: So he had already pushed you down?
>
> MS. MERCER: We – he was standing here, here's the front door, and he was standing here and -(undecipherable) – here when he walked in, I had sat and I got up and we were talking back and forth and he said, just a second, I forgot something, and then he went to turn like this and then I – like elbow. It's not aggressively pushing me but he pushed me down and then that's when Ricky had come – (undecipherable) – and he shot him.
>
> * * *
>
> UNIDENTIFIED SPEAKER: Did he say something about he would just trade you sex for it? Did he drop his pants, take off his shoes? I mean, what did he do?

12

MS. MERCER: He walked in and (undecipherable).

UNIDENTIFIED SPEAKER: What did that conversation entail?

MS. MERCER: Just how our night went and stuff and just having – (undecipherable) – conversation with – (undecipherable). And then when I had bent down, I bent down – (undecipherable) – cigarettes or what not, and then he had said, hold off, I forgot something, I said, all right, and I went to like move and I got knocked on the bed and then that's when Ricky just showed up – (inaudible).

UNIDENTIFIED SPEAKER: You got knocked well, you sound like you're having a fairly friendly conversation, am I right? He's not in there going, where's my money, where's my money?

MS. MERCER: He – no, he said, so how's your night going? I said, it went okay. And then he was like, well that's cool. I was like – (undecipherable) – and that's where I started to talk about, yeah – I said, yeah, you can just take the TV. And then he just said, just a second, I forgot something. I don't know if - (undecipherable) – something or what not, and then I heard the back door and that's when I – Ricky come around and –

UNIDENTIFIED SPEAKER: You got knocked down because of why?

MS. MERCER: I don't – he didn't move or anything, he was just standing there for a second and then when he (undecipherable) – Ricky come around with the gun and he just kinda looked at him and then looked down at me and then went to turn and then ...

\* \* \*

UNIDENTIFIED SPEAKER: But he was getting ready to walk out to the car – (undecipherable) – out of the house, right?

13

MS. MERCER: He was getting up, like I said, like when Ricky had come around he was acting sorta nervous and reached for something. But if he was just getting his phone. Like I said, I – I can't tell because (undecipherable) – wasn't paying attention so I don't know if he was reaching for a gun or what, and

UNIDENTIFIED SPEAKER: Did Ricky find a gun on him? Did he say he found a gun on him?

MS. MERCER: No.

(*Id.*, PageID.1120–1127.)

Finally, Mercer reiterated that she and Janish had not planned to kill Thomas and Hannah. She said that she told Janish about the threatening text messages from Thomas, that she asked Janish what they were "going to do about it, and he said, call them over here and I'll scare them a little bit and I'll take care of it." (*Id.*, PageID.1119.) She said that she responded "okay." (*Id.*)

## C

The police investigators ultimately concluded that Mercer and Janish were not telling the truth. The investigators believed that Mercer and Janish planned to kill Thomas and Hannah so that Mercer could avoid paying her drug debt.

In December 2011, Mercer and Janish were each charged with (1) one count of conspiracy to commit first-degree pre-meditated murder; (2) two counts of first-degree pre-meditated murder; (3) one count of third-degree arson, and (4) one count of tampering with evidence in a criminal case. (*See* 6/12/2012 Tr., ECF No. 7-7,

14

PageID.707–714.) They were tried jointly on these charges in a trial that began on June 11, 2012.

## D

In their opening statements at trial, the parties presented two starkly different versions of what happened on the night that Janish shot Thomas and Hannah. The prosecution insisted that Janish and Mercer planned and executed a scheme to kill the two drug dealers. According to the prosecution, the plan was as follows. Mercer lured Thomas and Hannah to Mercer's house by creating an "expectation […] that they were going to get paid." (6/12/2012 Tr., ECF No. 7-7, PageID.728.) When Thomas and Hannah arrived, Mercer distracted Thomas inside the house with the prospect of sex. With Thomas distracted, Janish ambushed and shot Hannah as Hannah sat in his car. Janish then hurried into the house and shot Thomas "before he [(Thomas)] realized what was really going on." (*Id.*, PageID.731.) Finally, Mercer and Janish worked together to dispose of the bodies and other evidence.

Janish's counsel went next. He first explained at length that there was no evidence supporting a conspiracy to kill Thomas and Hannah. (*See id.*, PageID.746–749.) He then contended that the evidence would show that Janish shot Thomas in defense of Mercer – more specifically, in order to prevent Thomas from sexually assaulting Mercer. In his words:

> [Janish] entered the entered the house through the back
> door and went to the gun cabinet, saw, I may have a

15

problem here, and picked up the shotgun that [the prosecutor] has brandished for you, and went around the corner. And again, this is a very tight, small building.

And what did he see when he went around the corner but Ms. Mercer and Mr. Thomas, all 300 pounds and six foot three or four of him, and he saw what he perceived, again, what he perceived, as her being pushed down and thrown down by Mr. Thomas. And again, this case, as I indicated from the very beginning of my discussions, is how you see the evidence. How Mr. Janish saw what was happening is very important.

(*Id.*, PageID.750.)   Janish's counsel said that, to defend Mercer from Thomas, Janish "pull[ed] the trigger, the gun went off […] and a result was instant death." (*Id.*, PageID.750–751.)

Janish's counsel further suggested that Janish killed Hannah in self-defense. (*See id.*, PageID.751–752.)   Janish's counsel indicated that Janish believed that Hannah was holding a handgun and posed an imminent threat to his (Janish's) safety. (*See id.*, PageID.752.)   Janish's counsel told the jury that Janish "dealt with that threat in the only way he thought he could" – *i.e.*, by shooting Hannah before Hannah had a chance to shoot him. (*Id.*)

Mercer's counsel echoed and expanded upon many of the same themes touched on by Janish's attorney.   For instance, Mercer's counsel underscored the threats posed by Hannah and Thomas.   To that end, he stressed the seriousness of the menacing nature of the text messages that Mercer received from Thomas: "When drug dealers say I'm gonna shoot your shit up, they don't mean they're coming to

16

wash your car and drink tea. They don't." (*Id.*, PageID.756.)  Moreover, he insisted

that Mercer's and Janish's recorded statements to police revealed that their intent

was only to "scare [Hannah and Thomas], scare them, scare them. Not kill them, not

shoot them, not burn their bodies, scare them." (*Id.*, PageID.757.)

## E

In its case-in-chief, the prosecution relied primarily on (1) Mercer's and

Janish's statements to police investigators, videos of which were played for the jury;

and (2) live witness testimony by Campbell.  As described above, Campbell had

been with Mercer when she obtained the crack from Thomas and when Mercer

received the first threatening text messages from Thomas on the night of October 29,

and the early morning of October 30, 2011.  Campbell testified that she could hear

Mercer and Janish discussing the threatening text messages the morning of October

30, 2011. (*See* 6/12/2012 Tr., ECF No. 7-7, PageID.872–873.)  She testified their

discussion went as follows:

> Q: Tell me what you remember the two of them discussing
> when you were there listening to that conversation.
>
> A: Well, [Mercer] was trying to explain to [Janish] what
> happened in the text but she was avoiding telling him that
> we stiffed him and she said that she got a text that
> [Thomas] was going to shoot up the house and [Janish is]
> like, "How should we handle this," and Barbie goes, "Oh,
> we should kill them, ha, ha, ha, ha, ha."
>
> * * *
>
> Q: What more discussion did you hear?

> A: They were talking about like ways to do it, like taking them to some area, catching their car on fire, breaking their necks, just different ways to kill them.

(*Id.*, PageID.873, 876.)  Campbell admitted, however, that she did not take Mercer's and Janish's conversation to be serious. (*See id.*, PageID.875–876.)  She also testified on direct examination that Mercer was not "nervous" about Thomas' threat to "shoot up" her house, but that Janish was "upset." (*Id.*, PageID.875.)

In a lengthy cross-examination, both defense attorneys impeached Campbell with her prior statements to investigators and with her preliminary examination testimony.  Most prominently, Mercer's counsel confronted Campbell with her preliminary examination testimony that Mercer was, in fact, "terrorized" by Thomas' threat. (6/13/2012 Tr., ECF No. 7-8, PageID.938–939.)  During this cross-examination, Campbell admitted that it was "not true" that Mercer was "nonchalant" regarding Thomas' threats. (*Id.*, PageID.947.)  Campbell also confirmed that Janish was "terrified" by Thomas' threats. (*Id.*, PageID.951.)  Mercer's counsel also elicited testimony from Campbell that she had heard Janish and Mercer discussing a plan that "include[d] talking to [Thomas] and trying to scare him[.]" (*Id.*, PageID.953.)

Neither Janish's counsel nor Mercer's counsel put on a defense.  Instead, they relied on their clients' own statements to police investigators and the text messages exchanged between Mercer and Thomas, both of which had been admitted by the prosecution.  They also elicited testimony from the prosecution's law enforcement

witnesses, including Detective Christopher Boulter of the Jackson County Major Crimes Task Force, regarding the seriousness of the danger posed by Thomas and Hannah to Mercer and Janish.  Det. Boulter described Thomas and Hannah as "mid to upper level drug dealers." (*Id.*, PageID.1171.)  Det. Boulter further confirmed that Thomas and Hannah "both ha[d] been involved in incidents of violence in the past." (*Id.*, PageID.1173.)   Because of this "violent criminal history," Det. Boulter characterized Thomas and Hannah as "dangerous men." (*Id.*, PageID.1172–1173.) Thus, he testified that he "would specifically take this threat [*i.e.*, Thomas' threat to shoot up Mercer's house] seriously[.]" (*Id.*, PageID.1172.)

<strong>F</strong>

At the close of trial, the state trial court took up requests for jury instructions. The attorneys first discussed the instructions with the trial judge in an off-the-record chambers conference. (*See, e.g.*, 6/14/2012 Tr., ECF No. 7-9, PageID.1264 (referring on the record to the conference that had occurred off the record).)  During that conference, Janish's counsel requested that the court give a self-defense instruction with respect to the killing of Hannah. (*See id.*, PageID.1280 (referring to the Court's indication in chambers that it would grant a self-defense instruction with respect to Hannah's death).)  Janish's counsel also asked the court to instruct the jury on the Defense of Mercer Defense – *i.e.*, to instruct the jury that if Janish shot Thomas to prevent him from raping Mercer, then the shooting was justified and did

19

not constitute a crime (the "Defense of Mercer Instruction"). (*See id.*, PageID.1279

(referring implicitly on the record to the request that had been made off the record).)

Mercer's counsel says that he joined in the in-chambers request for the Defense of

Mercer Instruction, though he harbored some questions about its applicability to

Mercer. (*See* 4/22/2014 Hr'g Tr., ECF No. 7-14, PageID.1470–1471.[3])

The Defense of Mercer instruction would have provided as follows:

> (1) [Janish] claims that [he] acted lawfully to defend
> [Mercer]. A person has the right to use force or even take
> a life to defend someone else under certain circumstances.
> If a person acts in lawful defense of another, [his] actions
> are justified and [he] is not guilty of [murder].

> (2) You should consider all the evidence and use the
> following rules to decide whether the defendant acted in
> lawful defense of another. Remember to judge the
> defendant's conduct according to how the circumstances
> appeared to [him] at the time [he] acted.

> (3) First, when [he] acted, the defendant must have
> honestly and reasonably believed that [Mercer] was in
> danger of being [sexually assaulted]. If [his] belief was
> honest and reasonable, [he] could act at once to defend
> Mercer, even if it turns out later that the defendant was
> wrong about how much danger Mercer was in.

> (4) Second, if the defendant was only afraid that Mercer
> would receive a minor injury, then [he] was not justified
> in killing or seriously injuring the attacker. The defendant

---

[3] Mercer's counsel offered this testimony at a post-trial evidentiary hearing to
develop a record concerning Mercer's claim on appeal that she had been deprived of
the effective assistance of counsel.  That hearing was held on April 22, 2014. (*See*
4/22/2014 Hr'g Tr., ECF No. 7-14.)  The trial judge and the trial prosecutor both
participated in the hearing.  Neither took issue with the claim by Mercer's counsel
that he had joined the in-chambers request for the Defense of Mercer Instruction.

must have been afraid that [Mercer] would be [sexually assaulted]. When you decide if [he] was so afraid, you should consider all the circumstances, such as: [the conditions of the people involved, including their relative strength / whether the other person was armed with a dangerous weapon or had some other means of injuring Mercer / the nature of the other person's attack or threat / whether the defendant knew about any previous violent acts or threats made by the attacker].

(5) Third, at the time [he] acted, the defendant must have honestly and reasonably believed that what [he] did was immediately necessary. Under the law, a person may only use as much force as [he] thinks is needed at the time to protect the other person. When you decide whether the force used appeared to be necessary, you may consider whether the defendant knew about any other ways of protecting Mercer, but you may also consider how the excitement of the moment affected the choice the defendant made.

(6) The defendant does not have to prove that [he] acted in defense of [Mercer]. Instead, the prosecutor must prove beyond a reasonable doubt that the defendant did not act in defense of [Mercer].

*See* Mich. Crim. JI 7.21.

At the conclusion of the in-chambers conference, the state trial court indicated that it would not give the Defense of Mercer Instruction. (*See* 6/14/2012 Tr., ECF No. 7-9, PageID.1279.)

When the parties went back on the record following the in-chambers conference, the court again addressed jury instructions issues. At that point, Mercer's counsel told the court that he would "defer to" Janish's counsel with respect to arguments about "self-defense" because he did not "believe that factually

21

the self defense – defenses 7.2 to 7.20 apply to my client." (*Id.*, PageID.1276.)

Mercer's counsel did not mention the Defense of Mercer Instruction at that point.

Moreover, the Michigan criminal jury instructions identified by Mercer's counsel all

relate to self-defense, not to the defense-of-others defense reflected in the Defense

of Mercer Instruction. *See* Mich. Crim. JI 7.2–7.20.  Simply put, the Defense of

Mercer Instruction, *see* Mich. Crim. JI 7.21, is not one of the instructions that

Mercer's counsel described as being factually inapplicable to Mercer.

With Mercer's counsel deferring to Janish's counsel on the issue of a self-

defense instruction, Janish's counsel formally requested such an instruction with

respect to the killing of Hannah. (*See* 6/14/2012 Tr., ECF No. 7-9, PageID.1279.)

The state trial court agreed to give that instruction. (*See id.*, PageID.1280.)

Janish's counsel then asked the court to give the Defense of Mercer Instruction

with respect to the killing of Thomas. (*See id.*, PageID.1279.)  The court declined to

do so. (*See id.*, PageID.1280.)

The court then asked all of the lawyers whether any of them had "anything

else […] to add before we conclude," and Mercer's counsel indicated that he had no

"other objections." (*Id.*, PageID.1280.)

## G

During closing arguments, the parties hammered on the themes that they had

highlighted in their opening statements.  The prosecution reiterated its theory that

22

Mercer and Janish planned and carried out a "double execution" of Thomas and Hannah. (6/15/2012 Tr., ECF No. 7-10, PageID.1319.)  And the prosecution insisted that Mercer and Janish carried out their plan "like clockwork." (*Id.*, PageID.1299.)

The prosecution also disputed the defense theory that Mercer and Janish were afraid of Thomas and Hannah at the time of the shootings.  The prosecution insisted that the threatening tone of the communications from Thomas and Hannah had dissipated over time: "[o]nce the steam blew off and [Thomas] realized that he had been cheated by one of his customers that was the end of the threats. There are no – no other[]" threats. (*Id.*, PageID.1294.)  The prosecution underscored that "the last exchange[d] text message was, I'm not going to do shit, I just want my money." (*Id.*, PageID.1295.)  The prosecution contended that if Mercer had been truly afraid, she could have turned Thomas and Hannah into the police – which she did not do. (*See id.*, PageID.1295–1296.)

The prosecution next attacked the credibility of the claim by Mercer and Janish in their statements to police investigators that they intended only to scare Thomas and Hannah. (*See id.*, PageID.1305.)  The prosecution claimed that such a plan was inconsistent with Mercer's and Janish's purported fear: "If you're dealing with somebody who is that terrifying and that ferocious, you're not going to simply scare them and hope they'll run away and not come back." (*Id.*, PageID.1314–1315.)  Instead, the prosecution claimed that the real plan was to kill Thomas and Hannah:

> So if they were genuinely afraid of these people, if they genuinely thought that these were death dealing merchants, that they were ferocious, terrible, horrible drug dealers who had just threatened to - - to shoot up their house, are you simply going to say boo? Or when the gun goes off and it's an empty chamber you're going to go my bad? You know, don't hold it against me, I'm just here to scare you. No.
>
> What you're going to do is you're going to blow their brains out. And then hope that you can -- you can get rid of the bodies or at least distort them to the point where nobody really knows what happened.

(*Id.*, PageID.1315.)

Finally, the prosecution disputed that Thomas and Hannah posed any threat to either Mercer or Janish once at the house.  First, the prosecution argued at length that Janish did not shoot Hannah in self-defense. (*See id.*, PageID.1303–1310.) Second, with respect to Thomas' death, the prosecution asserted that Mercer lied in her first statement to the police when she said that Thomas had tried to rape her:

> And what was going on in that bedroom? Well after you discount all of the lies that Ms. Mercer said in her first interview, which was about eighty to ninety percent lie, he did not push open the door, put his hand over her mouth and throw her down on the floor and start to rape her. That never even came close to happening. That's not what was going on here. Remember he was invited. He was invited over to get paid for his drugs.

(*Id.*, PageID.1311–1312.)   To the contrary, the prosecution asserted that Mercer voluntarily offered to have sex with Thomas to distract him while Janish shot him. (*See id.*, PageID.1302–1303, 1312.)  And, in conclusion, the prosecution emphasized

that neither Mercer nor Janish could claim self-defense with respect to Thomas'
death because that was "[o]ne for which the Judge will not allow the claim of self
defense to be heard. There's no valid self defense by law in this particular killing."
(*Id.*, PageID.1313.)

In response, Janish's counsel underscored the credibility of Thomas' threats
to Mercer.  He highlighted that Thomas and his partner Hannah were "mid level drug
dealers. (*Id.*, PageID.1323.)  He even read to the jury the threatening text messages
between Thomas and Mercer in an effort to show that Thomas and Hannah were
serious in their threats to Mercer. (*See id.*, PageID.1324–1327.)

Janish's counsel next argued there was no credible evidence of a conspiracy
to kill Thomas and Hannah.  He asserted that, instead, Mercer's and Janish's intent
was only to scare Thomas and Hannah.  He insisted that their statements to police
investigators confirmed this: "And then you look at their statements, neither one of
them told you that they conspired to commit murder. They just wanted to scare these
people. They had been threatened." (*Id.*, PageID.1332–1333.)

Janish's counsel finally argued that Janish shot both Thomas and Hannah out
of reasonable fear of imminent harm to himself and Mercer.  He contended that
Janish shot Hannah when Janish perceived Hannah to be reaching for what may have
been a weapon. (*See id.*, PageID.1335.)  And even though the state trial court refused
to give the Defense of Mercer Instruction with respect to Janish's shooting of

25

Thomas, Janish's attorney argued that Janish shot Thomas in an effort to protect

Mercer against an imminent sexual assault:

> In any event, he goes running back into the house. And what does he do? He grabs another shell, thinking there just might be a threat here. Maybe he didn't think that, maybe he just reacted. We don't know. But no more than a minute, minute and a half passed between the first incident with Mr. Hannah and the second incident with Mr. Thomas. So what does he do? And again, you saw the crime scene, you see how small it is.
>
> So he goes in that door, he turns the corner and there's plenty of testimony to suggest from all the statements, regardless of how you see it, that Mr. Thomas appeared to have either pushed her down or elbowed her down or bumped her down onto the bed. And again, that's all Mr. Janish sees. He doesn't know what's going on. Mr. Blumer alludes to the fact that maybe she's doing something to him. We don't know. We don't know. But he sees her either pushed down, elbowed down or bumped down. That's all he sees.

(*Id.*, PageID.1339–1340.)  He argued that Janish "assumed the role of protector and

he did what he felt he had to do" in shooting Thomas. (*Id.*, PageID.1340.)

Likewise, in Mercer's counsel's closing, he highlighted the gravity of the

threat posed by Thomas and Hannah.  He underscored Det. Boulter's testimony that

Thomas and Hannah were "violent men and that [their] threat should be taken

seriously." (*Id.*, PageID.1350.)   And, like Janish's counsel, he argued that

Campbell's testimony that Mercer was not afraid of Thomas' threats was not

credible. (*See id.*, PageID.1352–1354.)

Moreover, Mercer's counsel repeated the contention by Janish's counsel that Thomas posed an imminent threat to Mercer when Janish encountered Thomas in Mercer's bedroom.  He argued that "[w]hen [Thomas] walked in that bedroom where [Mercer] was he didn't have to holler or shout, his presence, the threat was already made, his presence." (*Id.*, PageID.1356.)

Finally, Mercer's counsel argued that Mercer's and Janish's sole intent in confronting Thomas and Hannah at Mercer's house was only to scare them away, not to kill them.  He, like Janish's counsel, implored the jury to consider Mercer's and Janish's statements to police investigators that all they wanted to do was to scare Thomas and Hannah: "If you think that there was ever a plan to do anything other than scare these people. Watch the tapes, watch the videos. […] No conspiracy. No conflamaration [sic]. No agreement. Just very sad people living very sad lives trying to make themselves and their home a little safer by chasing the boogey man away." (*Id.*, PageID.1357.)  He argued the only evidence supporting a conspiracy to kill Thomas and Hannah was Campbell's testimony, which he insisted was not credible. (*See id.*)

In rebuttal, the prosecution again vigorously attacked credibility of Mercer's and Janish's statements to police investigators – the statements that formed an essential pillar of their defenses.  The prosecution told the jury that the portions of

those statements that supported the defenses were "inherently unbelievable" under

Michigan law:

> Ladies and gentlemen, what we've heard from the defense reminds me of the old joke about the child who murders both of his parents and then pleads for mercy in court because he's an orphan. These two people executed the only people who can tell us what actually happened. And then they insist that we have to accept their version of the story that they told the police officers in the videotapes.
>
> No, you don't. You know, there are rules of law that talk about admissibility of evidence and you've all heard about hearsay. You may not know what it exactly means but you've heard the phrase before and there's a number of exceptions to the hearsay rule. But you know what the exceptions are all based on? *They're based on the concept that if a defendant says something that hurts him it's inherently believable and therefore it's admissible as evidence. If they say something that favors them it's inherently unbelievable and it's – and it's barred by hearsay.* Okay.

(*Id.*, PageID.1362–1363 (emphasis added).)  Mercer's counsel objected immediately

to the prosecutor's comments.   The state trial court responded only that: "The

hearsay rule is an extremely complicated rule of many parts. But go ahead, Mr.

[prosecutor]." (*Id.*, PageID.1363.)

The prosecution then continued its attack on the credibility of Mercer's and Janish's statements to investigators:

> It's built into our understanding of the law that if somebody gets up and says something that intentionally says something that hurts themselves you can have a right to go ahead and believe it. Because the law doesn't always lack common sense. A lot of people make jokes about it but there's a lot of common sense built into the law. *When somebody says something that completely favors themselves and you have no way of going around and find out whether you can check the truth of that statement, it's inherently unbelievable.*

(*Id.* (emphasis added).)   The prosecutor urged the jury to accept as "inherently believable" certain allegedly inculpatory portions from Mercer's and Janish's statements to investigators and to reject as "inherently unbelievable" certain exculpatory portions of those statements:

> Which part can you accept because it's inherently believable? There was an agreement. Which part can you reject because it's inherently unbelievable? We didn't really want to hurt them. We just wanted to scare them. It's inherently unbelievable. The defendants can't have it both ways. They can't sit here and argue to you with a straight face that they were terrified of these two [victims] because there was some reputation floating around the community that they were Don Corleone from – from the Godfather and they routinely had people killed and – and strung up and – and – or heads on posts as an example to what would happen if you don't pay.

(*Id.*, PageID.1365.)

**H**

The jury acquitted Mercer and Janish of conspiracy to commit first-degree murder and two counts of pre-meditated first-degree murder. (*See* 6/15/2012 Tr., ECF No. 7-10, PageID.1409–1410.)   As counsel for Respondent candidly acknowledged at a hearing before this Court on October 20, 2021, these acquittals indicate that the jury "necessarily rejected the [prosecution's] theory" that Janish killed Thomas "according to a plan."[4]

While the jury found Mercer and Janish not guilty of the most serious charges, it did convict Mercer of two counts of second-degree murder. (*See* 6/15/2012 Tr., ECF No. 7-10, PageID.1410.)  Since Mercer did not commit the killings, the jury necessarily found her guilty of second-degree murder as an aider and abettor – a theory of liability on which it was instructed. (*See id.*, PageID.1404.)  The jury also found Janish guilty of second-degree murder for the killing of Thomas, but it convicted him of only voluntary manslaughter with respect to Hannah's death. (*See id.*, PageID.1409.)   Finally, the jury found both Mercer and Janish guilty of tampering with evidence in a criminal case and third-degree arson. (*See id.*, PageID.1409–1410.)

---

[4] The official transcript of this hearing has not yet been prepared.  The Court has reviewed a rough transcript of the hearing, and that version reflects the quote above. The quote above is also consistent with the Court's independent recollection of counsel's statement at the hearing.  The Court is confident that the final version of the transcript will contain the quote above.

The state trial court later sentenced Mercer to two terms of life imprisonment for her two second-degree murder convictions, six to ten years' imprisonment for tampering with evidence, and three to five years' imprisonment for arson. (*See* 8/9/2012 Tr., ECF No. 7-13, PageID.1444.)

## I

Mercer filed a direct appeal in the Michigan Court of Appeals in which she raised the following six issues:

I.    THE TRIAL COURT DENIED DEFENDANT A FAIR TRIAL AND THE RIGHT TO PRESENT A DEFENSE BY DENYING THE REQUESTED INSTRUCTION ON DEFENSE OF OTHERS.

II.   THE ADMISSION OF THE NON-TESTIFYING CO-DEFENDANT'S STATEMENTS AGAINST DEFENDANT AT THEIR JOINT TRIAL VIOLATED THE HEARSAY RULE, DEFENDANT'S SIXTH AMENDMENT RIGHT TO CONFRONTATION, AND HER RIGHT TO A FAIR TRIAL; OR, IN THE ALTERNATIVE, COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT.

III.  DEFENDANT'S STATEMENT WAS INVOLUNTARY AND INADMISSIBLE WHERE POLICE THREATENED HER WITH FEDERAL PROSECUTION AND THE DEATH PENALTY IF SHE DID NOT GIVE THEM A STATEMENT; OR, IN THE ALTERNATIVE, FAILURE TO OBJECT DENIED HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

IV.   DEFENDANT WAS DENIED HER RIGHT TO ACCURATE INSTRUCTIONS ON THE LAW AND HER RIGHT T0°EFFECTIVE ASSISTANCE OF COUNSEL BY THE PRELIMINARY INSTRUCTION ON DURESS WHICH WAS LATER WITHDRAWN.

V.    THE PROSECUTOR'S MISSTATEMENT OF THE LAW DURING CLOSING ARGUMENTS DENIED DEFENDANT A FAIR TRIAL.

VI.    TRIAL COURT ERRED IN SENTENCING DEFENDANT TO LIFE IN
       PRISON BASED ON ITS ASSUMPTION THAT SHE WAS
       ACTUALLY GUILTY OF FIRST DEGREE MURDER, CHARGES OF
       WHICH SHE WAS ACQUITTED; DEFENDANT'S SENTENCE IS
       DISPROPORTIONATE AND CONSTITUTES CRUEL AND
       UNUSUAL PUNISHMENT IN VIOLATION OF BOTH THE STATE
       AND THE FEDERAL CONSTITUTIONS. CONST. 1963, ART. I, § 16;
       U.S. CONST. AM. VIII.

(Pet., ECF No. 1, PageID.45.)

That court affirmed Mercer's convictions and sentences. *See People v. Mercer*, 2014 WL 4262998 (Mich. Ct. App. Aug. 28, 2014).  The relevant portions of the Michigan Court of Appeals' decision are discussed in more detail below.

Mercer then filed an application for leave to appeal in the Michigan Supreme Court.  That court denied the application in a standard form order. *See People v. Mercer*, 863 N.W.2d 329 (Mich. 2015).

## J

Appearing *pro se*, Mercer filed a petition for a writ of habeas corpus in this Court on April 11, 2016. (*See* Pet., ECF No. 1.)  In her petition, Mercer raised the same six issues identified above that she argued on direct appeal.  The Court ordered Respondent to file a response (*see* Order, ECF No. 4), which he filed on October 21, 2016 (s*ee* Resp., ECF No. 9).  Mercer filed her reply on February 13, 2017. (*See* Reply, ECF No. 13.)

On January 10, 2019, the Court appointed the Federal Community Defender's Office to represent Mercer because the Court believed that she would benefit from the assistance of counsel. (*See* Order, ECF No. 14.)   Federal Defenders David Koelzer and Casey Swanson then entered appearances as counsel for Mercer.  Since their appointment, they have zealously and very effectively represented Mercer, and the Court is grateful for their willingness to accept the appointment.

On November 15, 2019, Koelzer and Swanson filed a supplemental brief (the "First Supplemental Brief") on Mercer's behalf focusing on three of Mercer's six issues: (1) the denial of the Defense of Mercer Instruction; (2) trial counsel's reliance on the legally inapplicable defense of duress; and (3) prosecutorial misconduct related to remarks made during rebuttal argument. (*See* First Supp. Br., ECF No. 20, PageID.1963.)  Respondent filed a supplemental response on January 14, 2020 (the "First Supplemental Response"). (*See* First Supp. Resp., ECF No. 21.)

After the United States Court of Appeals for the Sixth Circuit decided *Keahey v. Marquis*, 978 F.3d 474 (6th Cir. 2020) (holding that state trial court did not unreasonably apply clearly established federal law when it declined to give a self-defense instruction), the Court requested that the parties file a second round of supplemental briefing addressing the viability of Mercer's claim pertaining to the denial of the Defense of Mercer Instruction.  Koelzer and Swanson filed Mercer's brief (the "Second Supplemental Brief") on May 20, 2021 (*see* Second Supp. Br.,

ECF No. 28), and the Respondent filed his response on July 19, 2021 (the "Second Supplemental Response") (*see* Second Supp. Resp., ECF No. 30). The Court heard oral argument on Mercer's petition on October 20, 2021.

## II

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, limits the circumstances under which a district court may grant relief on habeas claims that have been adjudicated on the merits in state court. AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Importantly, where a petitioner makes a showing that satisfies Section 2254(d)(1) or Section 2254(d)(2), a district court "may review the [petitioner's] claim *de novo.*" *Rice v. White*, 660 F.3d 242, 257 (6th Cir. 2011) (reviewing habeas claim *de novo* because state court unreasonably determined the facts when ruling on the claim).[5]  In other words, where a petitioner shows that a state court decision was based upon an unreasonable application of clearly established federal law or an unreasonable determination of the facts, then a district court may conduct "a plenary review of the 'underlying [ ] claim ... unencumbered by the deference AEDPA normally requires.'" *Id.* at 251 (quoting *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007)).

## III

### A

The Court begins with Mercer's claim that the state trial court violated her due process right to present a defense when it declined to give the Defense of Mercer Instruction.  Mercer says that such an instruction was essential to her defense

---

[5] *See also Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) ("Because the Georgia Supreme Court unreasonably determined the facts relevant to Jones' Sixth Amendment claim, we do not owe the state court's findings deference under AEDPA. We therefore apply the pre-AEDPA *de novo* standard of review to Jones' habeas claims."); *Rodriguez v. McDonald*, 872 F.3d 908, 918 (9th Cir. 2017) ("If, considering only the record before the state court, we determine that the state court's decision was based on an unreasonable determination of the facts, we next evaluate the petitioner's legal claim *de novo* [.]").

because it would have permitted the jury to consider whether Janish's killing of Thomas was justified – and thus did not constitute a crime at all – on the ground that Janish acted to prevent Thomas from sexually assaulting her. Mercer stresses that if the jury reached that conclusion, then it could not have convicted her of aiding and abetting Thomas' murder. Mercer argues that the state trial court deprived her of due process when it prevented the jury from considering that viable complete defense. The Court agrees.

**B**

As a threshold matter, the Court considers whether Mercer procedurally defaulted her due process claim. At the final hearing before this Court on October 20, 2021, Respondent urged the Court to hold that Mercer did default the claim because (1) her trial counsel did not object on the record to the state trial court's refusal to give the Defense of Mercer Instruction and (2) the Michigan Court of Appeals deemed the claim to have been waived by her counsel's statement that he had no "other objections" to the instructions. *Mercer*, 2014 WL 4262998, at *7.

However, in Respondent's initial response to Mercer's habeas petition (filed by Respondent's prior counsel), Respondent took precisely the opposite position: he affirmatively "*concede[d]*" that "procedural default […] *do[es] not apply to this case*." (Resp., ECF No. 9, PageID.1858 (emphases added).) By making this concession, Respondent waived any procedural default defense that he may have

had. *See Maslonka v. Hoffner*, 900 F.3d 269, 276 (6th Cir. 2018) (holding habeas respondent "explicitly and deliberately waived" procedural default defense where respondent said in its answer that it was "not arguing that any of [petitioner's] habeas claims are barred by procedural default.").[6]  Current counsel for Respondent has candidly acknowledged the earlier waiver "carries through, even to [him] right now."[7]

Current counsel for Respondent argues that even though Respondent has waived the procedural default defense, the Court has the discretion to *sua sponte* enforce the defense against Mercer.  Assuming *arguendo* that the Court has such

---

[6] As the Sixth Circuit has explained, "procedural default 'is not a jurisdictional matter' and the state is therefore normally 'obligated to raise and preserve' any procedural-default defense 'if it is not to lose the right to assert the defense thereafter.'" *Maslonka,* 900 F.3d at 277 (quoting *Trest v. Cain*, 522 U.S. 87, 89 (1997)).  Simply put, Respondent "was required to assert procedural default as an affirmative defense in its responsive pleading," *Flood v. Phillips*, 90 F. App'x 108, 114 (6th Cir. 2004), and Respondent gave up his right to raise that defense when, in its responsive pleading, he said affirmatively that none of Mercer's claims were procedurally defaulted.

[7] Current counsel for Respondent is Assistant Attorney General Scott Shimkus.  He made the concession quoted above during the hearing before the Court on October 20, 2021.  As noted above, the final transcript of that hearing has not yet been prepared.  The Court commends Mr. Shimkus for his candor in acknowledging the waiver by prior counsel.  As Mr. Shimkus always does when he appears before this Court, he has zealously and very effectively represented his client and has comported himself with the highest ethical standards.  He is a credit to the Office of the Michigan Attorney General.

discretion,[8] the Court declines to exercise it here.  For all of the reasons explained throughout this Opinion and Order, the state trial court's failure to give the Defense of Mercer Instruction fundamentally undermined the fairness of Mercer's second-degree murder conviction related to the killing of Thomas.  Moreover, this case has been pending for nearly five years, and it was not until the final hearing before the Court that Respondent first raised the possibility of enforcing a procedural default against Mercer.

The Court concludes that, given Respondent's substantial delay, the resources that the parties have put toward briefing the merits arguments presently before the Court, the attendant prejudice that would result to Mercer if the Court raised the procedural default issue at this late stage, and the serious prejudice Mercer suffered as a result of the state trial court's error, the circumstances here do not warrant the

---

[8] Respondent directs the Court to *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) for the proposition that a court may "raise [the defense of procedural default] *sua sponte*."  However, as noted in *Lovins*, the Court is "not obligated to raise the issue *sua sponte*." *Id.* (quoting *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005)).  Moreover, the Sixth Circuit explained in *Maslonka* that "[a]lthough the Supreme Court has not absolutely barred us from considering *sua sponte* a *forfeited* habeas defense, it has said that we may not 'depart from the principle of party representation basic to our adversary system' by considering a waived habeas defense." *Maslonka*, 900 F.3d at 277 (emphasis added; quoting *Wood v. Milyard*, 566 U.S. 463, 472 (2012)).  Thus, it is unclear, under *Maslonka*, whether this Court even could consider Respondent's waived procedural default defense.  However, because the Court concludes (for the reasons provided in text above) that it will not exercise its discretion to consider Respondent's waived procedural default argument, it need not decide whether *Maslonka* bars it from doing so.

exercise of the Court's discretion to raise the procedural default issue *sua sponte*. *See Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004) (declining to raise procedural default *sua sponte* because, among other things, the parties and the district court had spent substantial time and resources addressing the merits and because the petitioner would suffer "serious consequences" from the court's independent raising of the defense). Instead, under all of these circumstances, the Court concludes that the most appropriate course of action is to hold Respondent to his express waiver of the procedural default defense.

## C

The Court now turns to the merits of Mercer's claim that the state trial court violated her right to due process by refusing to give the Defense of Mercer Instruction. Although the Michigan Court of Appeals initially deemed the claim to have been waived, the court did proceed to address the claim on the merits. The court concluded that Mercer was not entitled to the instruction because there was "no evidence" that Janish killed Thomas in order to prevent Thomas from raping Mercer. *Mercer*, 2014 WL 4262998, at **7–9. The court explained its reasoning as follows:

> "A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her." *People v. Dobek,* 274 Mich.App 58, 82; 732 NW2d 546 (2007). "A defendant asserting an affirmative defense must produce some evidence on all elements of the defense before the trial court is required to instruct the

jury regarding the affirmative defense." *People v. Crawford,* 232 Mich.App 608, 619; 591 NW2d 669 (1998).

The Self–Defense Act (SDA), MCL 780.971 *et seq.,* "codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Dupree,* 486 Mich. at 708. The SDA requires "that a person have an honest and reasonable belief that there is a danger of death, great bodily harm, or a sexual assault in order to justify the use of deadly force." *Guajardo,* 300 Mich.App at 35–36, citing MCL 780.972(1). "The reasonableness of a person's belief regarding the necessity of deadly force depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *Id.* at 42 (quotation omitted).

*In this case, there was no evidence to support that Janish had a "reasonable and honest belief" that the use of deadly force against Thomas was necessary to prevent imminent death, great bodily harm, or sexual assault.* Although Janish informed police that he instructed Thomas to "get off" defendant and to "leave her alone," there was no evidence that Janish had a reasonable belief that Thomas was sexually assaulting defendant or about to cause her harm. Thomas was not an intruder. Rather, defendant invited Thomas into the house. Evidence showed that defendant called and spoke with Hannah three minutes before Janish shot him. Janish and defendant admitted that defendant invited the victims to the house. Evidence supported the inference that Thomas arrived thinking that he was going to have sex with defendant in exchange for the crack cocaine.

Moreover, Thomas was not armed with a dangerous weapon and he did not physically assault defendant. Defendant testified that Thomas pushed her onto the bed in a non-aggressive manner. This evidence did not support that defendant was in imminent danger of death, great bodily harm, or sexual assault. *Instead the evidence*

40

> *showed that Janish planned to shoot Thomas irrespective of what he was doing in the front bedroom with defendant.* Janish admitted to police that he went outside with a shotgun immediately after the victims arrived. Janish shot and killed Hannah then walked back inside the house through the back door. Janish retrieved another shotgun shell from on top of a speaker, reloaded the shotgun, and walked to the front of the house where Thomas and defendant were located. Janish then immediately shot Thomas in the head. Furthermore, Janish admitted to police that he placed a gas can in the car beforehand because he knew he was going to burn evidence later that night. This evidence showed that Janish acted according to a plan. He had his shotgun loaded and ready to shoot Thomas before he even saw what Thomas was doing. *There was no evidence that Janish acted out of fear that defendant was in imminent danger.*
>
> Additionally, the threatening text message defendant received from the victims could not have justified the use of deadly force. Defendant received the text message hours before the shooting. At best the text message showed a potential threat of future harm and "threats of future harm do not constitute imminent danger." *Guajardo,* 300 Mich.App at 42.
>
> In sum, the trial court did not abuse its discretion in declining to provide the defense of others instruction and counsel did not act deficiently in failing to request the instruction. See *People v. Ericksen,* 288 Mich.App 192, 201; 793 NW2d 120 (2010) (counsel is not ineffective for failing to advance a meritless position).

*Id.* (emphases added).

## D

Because the Michigan Court of Appeals adjudicated Mercer's claim on the

merits, this Court cannot grant relief unless Mercer shows that the adjudication was

based upon an unreasonable determination of the facts, an unreasonable application of clearly established federal law, or was contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d).[9]  The Court undertakes that inquiry now.

## 1

Mercer initially argued that the Michigan Court of Appeals unreasonably applied clearly established federal law when it affirmed the state trial court's refusal to give the Defense of Mercer Instruction. (*See* First Supp. Br., ECF No. 20, PageID.1964.)  However, nearly a year after Mercer made that argument, the Sixth Circuit foreclosed it in *Keahey*, 978 F.3d at 478–81.  In *Keahey*, a habeas petitioner argued that a trial court's refusal to instruct a jury on self-defense was contrary to clearly established federal law or, alternatively, an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1). *See id.*  The Sixth Circuit disagreed, holding that "[b]ecause the Supreme Court has never clearly established [petitioner's] alleged constitutional right to a self-defense instruction and because the state court did not unreasonably apply the most relevant Supreme Court holdings, he has no basis for habeas relief under § 2254(d)(1)." *Id.* at 479.

---

[9] The portion of the Michigan Court of Appeals' decision addressing the merits of Mercer's claim is known as an "alternative merits adjudication" because it followed a procedural ruling rejecting the claim. *Baker v. Barrett*, 16 F. Supp. 3d 815, 827 (E.D. Mich. 2014).  In the face of such an adjudication, this Court may not grant relief unless Mercer satisfies one of the standards in 28 U.S.C. § 2254(d). *See Brooks v. Bagley*, 513 F.3d 618, 624–25 (6th Cir. 2008).

Mercer now concedes that "*Keahey* has eliminated [28 U.S.C. § 2254(d)(1)] as a viable legal theory for the instructional issue in this case." (Second Supp. Br., ECF No. 28, PageID.2012.)

**2**

Mercer also argues that the Michigan Court of Appeals' decision that she was not entitled to the Defense of Mercer Instruction was based on an "unreasonable determination of the facts." (Second Supp. Br., ECF No. 28, PageID.2012.)  More specifically, she contends that the Michigan Court of Appeals rested its ruling on its patently erroneous factual finding that there was "no evidence" that Janish killed Thomas to protect Mercer from a rape.  The Court agrees.

**a**

As an initial matter, the Michigan Court of Appeals' finding that there was "no evidence" that Janish killed Thomas to protect Mercer from a sexual assault is a factual determination that is subject to review under Section 2254(d)(2).  That determination was purely factual because it did not involve an "appli[cation of] the law to the record." *Will v. Lumpkin*, 978 F.3d 933, 942, n. 48 (5th Cir. 2020) (distinguishing between factual determinations properly reviewed under Section 2254(d)(2) and other determinations that must be reviewed under Section 2254(d)(1)).  Indeed, both the United States Supreme Court and the Sixth Circuit have treated similar state court findings – *i.e.*, findings that the record contained "no

43

evidence" on a particular factual matter – as determinations of fact that are properly analyzed under Section 2254(d)(2).

The Supreme Court did so in *Brumfield v. Cain*, 576 U.S. 305 (2015).   In *Brumfield*, a habeas petitioner had requested a post-conviction hearing to determine whether he was intellectually disabled and thus ineligible for the death penalty. *See id.* at 309.   Under the applicable Louisiana law, such a hearing is required where a defendant "put[s] forward sufficient evidence to raise a 'reasonable ground' to believe [them] to be intellectually disabled." *Id.*   The Louisiana trial court denied his request, finding in part that "he had presented no evidence of adaptive impairment" and therefore had not established intellectual disability. *Id.* at 313.   The petitioner appealed that decision to the Louisiana Supreme Court, and that court "summarily denied his application[.]" *Id.* at 310.

The United States Supreme Court then held the Louisiana trial court's finding that the petitioner had presented "no evidence of adaptive impairment" was an "unreasonable determination of fact" under Section 2254(d)(2). *Id.* at 317.   The Supreme Court found that the record before the trial court suggested the petitioner met, or arguably could have met, three out of six factors required to establish "adaptive impairment" and thus qualified as intellectually disabled under Louisiana state law. *Id.* at 319.   The Supreme Court held that the state court's determination that "no evidence" supported such a finding was an unreasonable factual finding

because "[t]he record before the state court contained sufficient evidence to raise a question as to whether [petitioner] met the[] criteria." *Id.* at 317. *Brumfield* thus makes clear that a state court's finding that the record contains "no evidence" of a particular fact is, itself, a factual determination subject to review under Section 2254(d)(2).

The Sixth Circuit's decision in *Wofford v. Woods*, 969 F.3d 685, 697–98 (6th Cir. 2020), further confirms the point. The petitioner in *Wofford* challenged the state trial court's removal of a juror during deliberations. On appeal, the Michigan Court of Appeals rejected the petitioner's claim concerning the removal of the juror and affirmed his conviction. In the course of its analysis, that court found, among other things, that there was "'no evidence' of 'what way the jury was leaning' or 'the potential division' at the time [the juror] was removed." *Id.* at 697 (quoting *People v. Wofford*, 2015 WL 1214463, at *2 (Mich. Ct. App. Mar. 17, 2015)). On habeas review, the Sixth Circuit treated the state appellate court's "no evidence" finding as a factual determination that was subject to review under Section 2254(d)(2). *Id.* at 697–98.

The Fifth Circuit did the same in *Will,* 978 F.3d 933. The petitioner in *Will* argued that he was deprived of a fair trial by the presence of numerous uniformed, off-duty police officers in the courtroom during his trial. The state appellate court denied relief on that claim. The state court distinguished Will's case from a

precedent on which Will relied on the ground that in Will's case, "there [was] no evidence that any of [Will's] jurors had close ties to law enforcement." *Id*. at 941. The Fifth Circuit treated the state court's "no evidence" finding as a factual determination that was subject to review under Section 2254(d)(2). *See id*. at 941–42. Taken together, *Brumfield*, *Wofford*, and *Will* establish that a state appellate court's finding that the record contains "no evidence" on a particular factual point – like the finding by the Michigan Court of Appeals that the record contained "no evidence" that Janish killed Thomas to prevent him from raping Mercer – is a factual determination that is properly reviewed under Section 2254(d)(2).

Respondent counters that the Michigan Court of Appeals' "no evidence" finding should not be seen as a factual determination subject to review under Section 2254(d)(2). Respondent focuses on the context in which the state court made that finding: when deciding whether Mercer was entitled to the Defense of Mercer Instruction. Respondent notes that (1) the question of whether a criminal defendant is entitled to a jury instruction is a mixed question of law and fact, and (2) state court determinations on such mixed questions are reviewed under Section 2254(d)(1), not as factual determinations under Section 2254(d)(2). Respondent then concludes that since the state court made the "no evidence" finding when assessing whether Mercer was entitled to the Defense of Mercer Instruction – a mixed question of law and fact

46

– the finding must be reviewed under Section 2254(d)(1) rather than under Section 2254(d)(2).  Respondent is only partly correct.

A trial court's *ultimate* "decision about whether to provide a jury instruction is not the kind of fact-based determination subject to scrutiny under Section 2254(d)(2)." *McMullan v. Booker*, 761 F.3d 662, 671 (6th Cir. 2014).  That is because such a decision is "fundamentally a legal one." *Id*.  In deciding whether an instruction is warranted, a judge takes the evidence adduced at trial and then applies "legal principles and presumptions" to that evidence. *Id*.  Thus, where a petitioner challenges a state court's *ultimate* decision to withhold a jury instruction, a federal court on habeas review must apply Section 2254(d)(1) and must determine whether the state court unreasonably applied clearly established federal law. *See id*.[10]

But that does not mean that a federal court on habeas must apply Section 2254(d)(1) to the factual findings that underlie a state court's ultimate decision not

_____

[10] Notably, the Sixth Circuit in *McMullan* stressed that there was "no basis in the record to conclude that the trial court disregarded the evidence cited by McMullan's [trial] counsel" in support of his request for the jury instruction that the trial court declined to give. *McMullan*, 761 F.3d at 668.  Thus, the sole question before the Sixth Circuit was whether the state trial court properly evaluated that evidence – a question that had to be reviewed under Section 2254(d)(1).  Here, in contrast (and as explained in more detail below), Mercer has shown that the Michigan Court of Appeals ignored substantial evidence that supported the Defense of Mercer Defense and which required the trial court to give the Defense of Mercer Instruction.  Simply put, the error about which Mercer complains – a state court factual finding that was made in clear disregard of the evidence in the record – differs from the error about which the petitioner in *McMullan* complained.

to give a particular instruction. "[A] federal court reviewing a state court conclusion on a mixed issue involving questions both of fact and law" – like the ultimate question of whether to give a jury instruction – "must first separate the legal conclusions from the factual determinations that underlie it." *Lambert v. Blodgett*, 393 F.3d 943, 977–78 (9th Cir. 2004). The *legal* conclusions are reviewed under Section 2254(d)(1); however, the *factual* determinations that underlie the legal conclusions are reviewed under Section 2254(d)(2). *See id.*; *cf. Seymour v. Walker*, 224 F.3d 542, 553 n.3 (6th Cir. 2000) ("In the due process context, the Supreme Court has explained that voluntariness of a confession is a question of law, reviewed under § 2254(d)(1), and the 'subsidiary factual questions' surrounding the confession are reviewed deferentially under § 2254(d)(2) and § 2254(e)(1).").

Here, for all of the reasons explained above, the Michigan Court of Appeals' finding that there was "no evidence" that Janish killed Thomas to prevent a rape was a factual determination underlying the court's ultimate decision that the trial court

properly withheld the Defense of Mercer Instruction.  This subsidiary factual

determination is properly reviewed under Section 2254(d)(2). [11]

**b**

Next, the Michigan Court of Appeals' "no evidence" finding was

unreasonable.  "A state court decision involves 'an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding' only if it is

shown that the state court's presumptively correct factual findings are rebutted by

'clear and convincing evidence' and do not have support in the record." *Matthews v.

Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting 28 U.S.C. § 2254(e)(1)).  That

standard is met here.

---

[11] This case is also distinguishable from another recent case decided by this Court, *Bergman v. Brewer*, 2021 WL 4389277 (E.D. Mich. Sept. 24, 2021).  In *Bergman*, this Court held that the Michigan Court of Appeals did not make a factual finding when it concluded that the petitioner's counsel "did not explain why she could not safely proceed to trial without her own [defense toxicology] expert." *Id.* at *3. Unlike that determination in *Bergman*, the court's "no evidence" finding in Mercer's fits squarely in the *Brumfield* and *Woodford* line of cases treating similar findings as properly reviewed under Section 2254(d)(2).  Moreover, the context of the Michigan Court of Appeals' "did not explain" statement in *Bergman* made clear that the statement was not a factual finding.  For instance, immediately after saying that Bergman's lawyer "did not explain" why he needed an expert, the court cited to a statute requiring a defendant to *sufficiently* explain her need for an expert. *People v. Bergman*, 879 N.W.2d 278, 289 (Mich. Ct. App. 2015) (citing Mich. Comp. Laws § 775.15).  This context (along with the other context highlighted by this Court in its decision in *Bergman*) suggests that the court applied a legal rule to the factual record, and it sharply distinguishes the Michigan Court of Appeals' "did not explain" statement in *Bergman* from its "no evidence" finding here.

As noted above, the Michigan Court of Appeals held that Mercer was not entitled to the Defense of Mercer Instruction because "[t]here was *no evidence* that Janish acted out of fear that [Mercer] was in imminent danger." *Mercer*, 2014 WL 4262998, at *8 (emphasis added). That factual determination was unreasonable.

There clearly was evidence in the trial record that Janish shot Thomas in defense of Mercer. In Mercer's first statement to police investigators, Mercer said that Thomas had just "pushed [her] down and tried to rape [her]" (6/13/2012 Tr., ECF No. 7-8, PageID.1041.) Mercer then told investigators that at that point, Janish entered the room, "told [Thomas] to get off of [her]," and that when "[Thomas] didn't at first," Janish "put the gun to his head and […] then he [] shot him" while Thomas was "on top of" her. (*Id.*, PageID.1041, 1029.)

Janish's own statement to investigators, which was also admitted at trial, provided even more evidence that he may have honestly and reasonably believed that Thomas was about to sexually assault Mercer. Janish told investigators that he saw that Thomas had "tried to grab a hold of" Mercer, "pushed [her] down on the bed," and that Thomas was "[t]rying to have sex with her." (*Id.*, PageID.1099.) Janish said this "[f]reaked [him] out." (*Id.*) Like Mercer, Janish said he "told [Thomas] to get off [Mercer], to leave her alone." (6/14/2012 Tr., ECF No. 7-9, PageID.1205.) Janish said that when Thomas did not get off Mercer, he (Janish) then shot Thomas. (*Id.*)

Moreover, the trial record contained evidence that Thomas posed – and had made – a grave threat to Mercer's safety. According to the prosecution's own witness, Det. Boulter, who was qualified as an expert in crime interdiction, Thomas was a "mid to upper level drug dealer[]," had a "violent criminal history," and was "dangerous." (6/13/2012 Tr., ECF No. 7-8, PageID.1171–1173.) And, days prior to this incident, Thomas had threatened to shoot up Mercer's house in response to her stealing $150 worth of crack cocaine from him. (*See id.*, PageID.989–990.) Testimony indicated Mercer was, at the very least, "paranoid" about Thomas' threat. (*Id.*, PageID.939.) There was also testimony that Mercer had communicated this threat to Janish and that he was "scared" and "terrified" by it. (6/12/2012 Tr., ECF No. 7-7, PageID.876; 6/13/2012 Tr., ECF No. 7-8, PageID.951.) Finally, Det. Boulter testified that he would have taken Thomas' threat to shoot up Mercer's house "seriously." (6/13/2012 Tr., ECF No. 7-8, PageID.1172.) All of this evidence provides the context against which Janish observed Thomas' interaction with Mercer, in the bedroom, immediately prior to shooting him. That context adds further evidentiary support to the contention that Janish shot Thomas based upon his reasonable belief that Thomas was about to sexually assault Mercer. On this record, the Michigan Court of Appeals' factual determination that there was "no evidence" that Janish killed Thomas in order to prevent him from raping Mercer was plainly unreasonable.

Indeed, Respondent has effectively *conceded*, in direct contradiction to the Michigan Court of Appeals' finding, that the record *did* contain evidence that Janish shot Thomas based upon his reasonable and honest belief that Thomas was about to rape Mercer. More specifically, Respondent acknowledged that (1) "both Mercer and Janish claim[ed]" that "Janish shot Thomas" as Thomas was trying "to rape" Mercer and (2) therefore, "Janish was entitled to a defense-of-others instruction." (Resp., ECF No. 9, PageID.1875.) By admitting that Janish was "entitled" to the Defense of Mercer Instruction, Respondent necessarily acknowledged that the record contained at least *"some evidence* from which the jury c[ould] conclude that the essential elements" of the Defense of Mercer Defense were satisfied. *People v. Leffew*, --- N.W.2d ---, 2022 WL 246549, at *9 (Mich., Jan 26, 2022) (emphasis added) (quoting *People v. Lemons*, 562 N.W.2d 447, 453 (Mich. 1997) (identifying the quantum of evidence that a defendant must produce in order to be entitled to defense-of-others instruction)).[12]   Respondent's concession underscores the unreasonableness of the Michigan Court of Appeals' finding that the record contained "no evidence" that Janish shot Thomas to prevent Thomas from sexually assaulting Mercer.

---

[12] While the Michigan Supreme Court decided *Leffew* after Mercer's trial and direct appeal, the court did not break any new ground when it stated the rule set forth in text above. Rather, as support for that rule, the court quoted from *Lemons* (citation in text) which was decided long before Mercer's trial and appeal.

The Michigan Court of Appeals appears to have discounted the evidence supporting the Defense of Mercer Instruction because the court was firmly convinced that Janish killed Thomas according to a preconceived plan. *See Mercer*, 2014 WL 4262998, at *8 ("Th[e] evidence showed that Janish acted according to a plan. He had his shotgun loaded and ready to shoot Thomas before he even saw what Thomas was doing. There was no evidence that Janish acted out of fear that defendant was in imminent danger."). But the court's certainty that Mercer and Janish planned to kill Thomas all along is highly problematic on this record. As explained at length above, the trial in this case primarily focused on whether Janish and Mercer acted pursuant to a plan, and, as Respondent has acknowledged, the jury rejected the prosecution's contention that they did so. Indeed, the jury acquitted Janish and Mercer of the charges that hinged upon the prosecution's claim that they acted according to a plan. The Michigan Court of Appeals' confidence that Janish and Mercer acted accorded to a plan is difficult, if not impossible, to reconcile with the jury's reasonable doubt that they did so. In the end, though, it does not matter precisely *why* the Michigan Court of Appeals found that there was "no evidence" that Janish killed Thomas to protect Mercer from a sexual assault. The essential point is that the court made that factual determination and that it was unreasonable.

In sum, the trial record in this case "clear[ly] and convincing[ly]" rebuts the Michigan Court of Appeals' factual determination that there was "no evidence" that

Janish shot Thomas in order to stop him from sexually assaulting Mercer. *See Matthews*, 486 F.3d at 889.  That determination was therefore unreasonable.

<strong>c</strong>

Finally, the Michigan Court of Appeals' decision that the state trial court properly withheld the Defense of Mercer Instruction was "based on" its unreasonable fact determination. 28 U.S.C. 2254(d)(2).  Indeed, even a cursory review of the state court's decision makes clear that that court rejected Mercer's claim based upon its unreasonable determination that the record contained "no evidence" that Janish killed Thomas in order to prevent Thomas from raping Mercer. Section 2254(d)(2) is therefore satisfied.

<strong>E</strong>

Because the Michigan Court of Appeals rejected Mercer's due process claim based upon on an unreasonable determination of the facts, the Court "may review the claim *de novo." Rice,* 660 F.3d at 257.  On *de novo* review, the Court may grant habeas relief if Mercer "show[s] that [s]he is being held in violation of federal law by identifying, and prevailing on, a federal claim." *Id.*  For the reasons explained below, the Court concludes that Mercer has made this required showing, and she is therefore entitled to relief on her due process claim.

54

**1**

To begin, Mercer's claim is cognizable on federal habeas review.  She alleges that the state trial court violated her due process "right to present a defense by denying" the Defense of Mercer Instruction. (First Supp. Br., ECF No. 20, PageID.1964.)   This is a claim of federal constitutional error that may be "entertain[ed]" by this Court in these habeas proceedings. 28 U.S.C. § 2254(a) (providing that a district court may adjudicate a habeas claim in which a state prisoner claims that she is being held "in violation of the Constitution or laws of the United States").

The Court acknowledges that "instructional errors of state law generally may not form the basis for federal habeas relief." *Gilmore v. Taylor*, 508 U.S. 333, 344 (1993).  However, there is a substantial body of case law indicating that a state court's failure to instruct on a key defense, like the Defense of Mercer Defense here, may rise to the level of a due process violation warranting habeas relief where, as in this case, the evidence amply supports the defense and the failure to give the instruction renders the trial fundamentally unfair.

The Sixth Circuit made this very point in *Taylor v. Withrow*, 288 F.3d 846, 851–52 (6th Cir. 2002).  In that case, the Sixth Circuit said:

> A state does not, however, have an unfettered right to run its court proceedings in any manner at all. There are a few customs and principles "so rooted in the traditions and conscience of our people as to be ranked as fundamental,"

and depriving a defendant of one of these in a criminal trial is constitutional error.

We hold that the right of a defendant in a criminal trial to assert self-defense is one of those fundamental rights, and that failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the due process clause. It is indisputably federal law as announced by the Supreme Court that a defendant in a criminal trial has the right to "a meaningful opportunity to present a complete defense." A necessary corollary of this holding is the rule that a defendant in a criminal trial has the right, under appropriate circumstances, to have the jury instructed on his or her defense, for the right to present a defense would be meaningless were a trial court completely free to ignore that defense when giving instructions.

*Id.* (internal citations omitted).[13]

While the Sixth Circuit later referred to this language from *Taylor* as dicta, *see Keahey*, 978 F.3d at 480, other circuit courts of appeals have squarely held that refusing to instruct the jury on a key viable defense like self-defense may constitute a violation of due process where the refusal renders the petitioner's trial fundamentally unfair. *See Davis v. Strack*, 270 F.3d 111, 132 (2d Cir. 2001) (holding that a failure to instruct on a properly-supported justification defense "had such enormous practical importance […] that it must be considered a violation of due

---

[13] *See also, e.g., Horton v. Warden, Trumbull Corr. Inst.*, 498 F. App'x 515, 520 (6th Cir. 2012) (finding petitioner's "claim[] that he was deprived of due process because the trial court refused to give instructions on self-defense and negligent homicide […] raised a cognizable habeas issue").

process"); *Jackson v. Edwards*, 404 F.3d 612, 625 (2d Cir. 2005) (holding that a failure to provide a justification instruction warranted by the evidence was "nothing short of a catastrophic error" that "constituted a violation of due process") (internal citations and quotation marks omitted); *U.S. ex rel. Means v. Solem*, 646 F.2d 322, 332 (8th Cir. 1980) (holding "the omission of the requested instruction on self-defense and defense of others […] so infected the entire trial that the resulting conviction violate[d] due process") (internal citations and quotation marks omitted).

Similarly, several state courts, including courts in Michigan, have recognized a trial court's failure to instruct the jury on a viable defense may violate a criminal defendant's federal due process rights where the failure undermines the essential fairness of the trial. *See Leffew*, --- N.W.2d.---, 2022 WL 246549, at *9 (observing that "[i]nstructional errors that directly affect a defendant's theory of defense can infringe a defendant's due process right to present a defense.") (quoting *People v. Kurr*, 654 N.W.2d 651, 656 (Mich. App. 2002)); *State v. Edwards*, 661 A.2d 1037, 1041 (Conn. 1995) (holding it is a "well-established" legal principle that the constitutional right to present a defense "includes proper jury instructions on the elements of self-defense"); *State v. Baker*, 114 A.3d 214, 218 (Me. 2015) (holding trial court's failure to properly instruct the jury on self-defense "resulted in the deprivation of [defendant's] constitutional rights to due process and to trial by jury"). Indeed, the Michigan Court of Appeals has squarely held that where, as in Mercer's

case, there is "sufficient evidence" supporting a defense of others defense, "the failure to give a defense of others jury instruction deprive[s a] defendant of her due process right to present a defense" and therefore warrants a new trial. *Kurr*, 654 N.W.2d at 657.

Based upon this substantial body of federal and state case law, the Court is persuaded that Mercer's due process claim here – *i.e.*, that the state trial court's erroneous refusal to give the Defense of Mercer Instruction rendered her trial fundamentally unfair – is a viable federal claim that is cognizable in these proceedings.

Respondent counters that *Keahey* forecloses the conclusion that a failure to instruct on a state-law defense may rise to the level of a federal due process violation. The Court disagrees. As discussed above in Part (III)(D)(1), the question decided in *Keahey* was whether the state court's refusal to instruct the jury on self-defense "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Keahey*, 978 F.3d at 477 (quoting 28 U.S.C. § 2254(d)(1)). The Sixth Circuit in *Keahey* held only that the failure to instruct on self-defense did not contravene any express holding by the United States Supreme Court. *See id.* at 479. That narrow holding does not preclude this Court from concluding, on *de novo* review – under which this Court may look beyond the specific holding of Supreme Court decisions – that the failure to give the

58

Defense of Mercer Instruction rose to the level of a due process violation. *See, e.g.,*
*Pouncy v. Palmer*, 846 F.3d 144, 161 (6th Cir. 2017) ("Were we to evaluate
[petitioner's] claim *de novo*, we might very well apply a different standard in this
case. However, under [Section 2254(d)(1)], federal habeas courts must tread
carefully in the absence of more specific holdings from the Supreme Court.").

## 2

Having concluded that Mercer states a cognizable federal claim, the Court
next addresses whether Mercer has shown that she is entitled to "prevail[]" on that
claim. *Rice,* 660 F.3d at 257.  The Court adopts and applies the Second Circuit's test
for determining when a failure to instruct on a defense violates a defendant's due
process rights.  Under this test, the first question is: "was the [Defense of Mercer
Instruction] required as a matter of [Michigan] law?" *Davis*, 270 F.3d at 124.  If so,
the second question is: did the failure to provide the Instruction "so infect[]the entire
trial that the resulting conviction violate[d] due process?" *Id.* at 131 (quoting *Cupp
v. Naughten*, 414 U.S. 141, 147 (1973)).[14]  Here, the answer to both questions is
"yes."

---

[14] *Davis* set forth a third question – whether the failure to instruct "is remediable by
habeas corpus, given the limitations prescribed by 28 U.S.C. § 2254[(d)(1) & (2)]."
*Davis*, 270 F.3d at 124.  Here, the Court has already concluded that the Michigan
Court of Appeals' decision was based upon an "unreasonable determination of the
facts," and thus the "limitations" in Section 2254(d) do not preclude Mercer's claim
for relief.  Given the Court's earlier extensive analysis under Section 2254(d)(2), the
Court will not separately analyze here the third question from *Davis*.

**a**

First, the Defense of Mercer Instruction was required under Michigan law. Under that law, a defendant "is entitled to an instruction" on an affirmative defense, like the Defense of Mercer Defense here, where the defendant "produc[es] '*some evidence* from which the jury can conclude that the essential elements of [the defense] are present.'" *Leffew*, --- N.W.2d ---, 2022 WL 246549, at *9 (emphasis added) (quoting. *Lemons*, 562 N.W.2d at 453). "The defendant's burden is not a heavy one." *Id.* (citing *United States v. Johnson*, 416 F.3d 464, 467 (6th Cir. 2005)). "Even when the supporting evidence is weak or of doubtful credibility[,] its presence requires an instruction on the theory of defense." *Id.* (quoting *United States v. Garner*, 529 F.2d 962, 970 (6th Cir. 1976)). Accordingly, the state trial court was required to give the Defense of Mercer Instruction so long as there was "some evidence" that Janish honestly and reasonably believed that (1) Mercer was in danger of being sexually assaulted and (2) using deadly force against Thomas was immediately necessary to prevent Mercer from being sexually assaulted. *See* Mich. Crim. JI 7.21 (the model defense of others instruction); *see also* Mich. Comp. Laws § 780.972(1). For all of the reasons explained in detail above in section Part (III)(D)(2)(b), the record contained "some evidence" on both of these points, and thus the evidence was sufficient to warrant the giving of the Defense of Mercer Instruction.

To be sure, the record also contained evidence casting doubt on the Defense of Mercer Defense.  For instance, Mercer's second statement to police investigators undercuts, at least to some degree, the notion that Thomas was attempting to rape Mercer.  But the fact that there may have been evidence cutting against the Defense of Mercer Defense does not mean that the state trial court acted properly when it declined to give the Defense of Mercer Instruction.  On the contrary, under Michigan law, it was for the jury to resolve the conflict in the evidence concerning whether Janish shot Thomas in order to protect Mercer from a sexual assault. *See Leffew*, --- N.W.2d ---, 2022 WL 246549, at *9 ("Even when the supporting evidence is weak or of doubtful credibility its presence requires an instruction on the theory of defense. […] The sufficiency of the evidence of a defendant's [defense of others] theory is 'for the jury to decide under proper instructions[.]") (internal quotation marks and citations omitted); *People v. Kupinski*, 2018 WL 3186188, at *3 (Mich. Ct. App. June 28, 2018) (explaining that it was "the jury's prerogative" to assess conflicting evidence concerning whether defendant acted to defend himself and a third person).

Finally, Mercer was entitled to the Defense of Mercer Instruction even though she did not personally act in defense of anyone else – and even though she was the one whom Janish claimed to be defending when he killed Thomas.  That is because Mercer was charged with Thomas' murder as an aider and abettor, and under settled Michigan law, "an aider and abettor is relieved of liability if the principal" was

justified in committing the allegedly-criminal act. *People v. Rajput*, 949 N.W.2d 32, 34 (Mich. 2020) (explaining that alleged aider and abettor cannot be convicted where the principal commits the alleged crime in lawful self-defense), as amended on reconsideration (June 5, 2020).  Thus, the Defense of Mercer Defense applied just as much to Mercer as it did to Janish even though Mercer did not pull the trigger. Indeed, if Janish killed Thomas to protect Mercer from a sexual assault, then the killing of Thomas would not have been murder – in fact, would not have been a crime at all – and thus Mercer could not have been convicted of any offense in connection with that killing.  Because this defense applied fully to Mercer (and was supported by sufficient evidence), she had a right to have the jury instructed on that defense. *See Neal v. Booker*, 497 F. App'x 445, 450–51 (6th Cir. 2012) (recognizing that under Michigan law, an alleged aider and abettor has a right to a jury instruction that the principal committed killing in self-defense where there is sufficient evidence that the principal did so).[15]

---

[15] At the post-trial evidentiary hearing before the state trial court, that court acknowledged that Mercer could not have been convicted of the second-degree murder of Thomas if Janish had killed Thomas in order to protect Mercer from him. (*See* 4/22/2014 Hr'g Tr., ECF No. 7-14, PageID.1482 (emphases added) ("[I]f somehow Janish had been found not guilty based on a defense of others, *there's no way that Ms. Mercer could then be found guilty*. Or, if the jury had made an inconsistent verdict, at that point then *I could have always set it aside.*").)

**b**

Second, the state trial court's refusal to provide the Defense of Mercer Instruction materially undermined the fairness of Mercer's trial in two respects: it eliminated a heavy burden from the prosecution's case, and it deprived Mercer of her only viable complete defense to the second-degree murder and manslaughter charges related to the killing of Thomas. The refusal to give the instruction therefore "so infect[ed] the entire trial that the resulting conviction violate[d] due process." *Davis*, 270 F.3d at 131 (quoting *Cupp*, 414 U.S. at 147).

**i**

The state trial court's failure to give the Defense of Mercer Instruction freed the prosecution from the weighty burden of having to prove a hotly-disputed point beyond a reasonable doubt. A comparison of the state trial court's second-degree murder instruction, as given at Mercer's trial, with the instructions as they would read if the state trial court had given the Defense of Mercer Instruction illustrates this point.

The state trial court instructed the jury that the prosecution had to prove only two elements beyond a reasonable doubt in order to establish that the killing of Thomas constituted second-degree murder:

> First, that the defendants caused the death of Anthony Hannah and/or Shemel Thomas. That is, Anthony Hannah and/or Shemel Thomas died as a result of being shot with a firearm.

> Second, that each of the defendants had one of three states
> of mind.  He or she intended to kill or he or she intended
> to do great bodily harm or he or she knowingly created a
> very high risk of death or great bodily harm knowing that
> death or such harm would be the likely result of his or her
> actions.[16]

(6/15/2012 Tr., ECF No. 7-10, PageID.1397–1398.)

The Defense of Mercer Instruction would have informed the jury that the prosecution also had to "prove beyond a reasonable doubt that [Janish] did not act in defense of [Mercer]." Mich. Crim. JI 7.21(6) (defense of others standard instruction).  And giving the Defense of Mercer Instruction would have triggered the state trial court's further duty to instruct the jury that the prosecution had to prove an additional element of second-degree murder – "that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime" – beyond a reasonable doubt. Mich. Crim. JI 16.5(4).  This element is added to the second-degree murder instructions whenever a Michigan trial court gives an instruction – such as the Defense of Mercer Instruction – on a justification defense. *See* Use Note 4 to Mich. Crim. JI 16.5.  By omitting the Defense of Mercer Instruction, and the instruction of the additional element of second-degree murder that would have accompanied the Defense of Mercer Instruction, the state trial court freed the

---

[16] This is the standard second-degree murder instruction that a Michigan trial court gives when a defendant presents *no* evidence that the killing at issue was justified. *See* Use Note to Mich. Crim. JI 16.5 (second-degree murder standard instruction).

prosecution from the heavy burden of having to prove beyond a reasonable doubt that Janish did not kill Thomas in order to protect Mercer.

And there is reason to believe that the prosecution could not have carried that substantial burden.  First, the prosecution itself expressed doubt about its ability to disprove a justification defense beyond a reasonable doubt.  The prosecutor told the state trial court that "put[ting] the burden of proof on the prosecution to disprove [such a] defense […] places an unreasonable burden on the prosecution that can almost never be met under many circumstances." (6/14/2012 Tr., ECF No. 7-9, PageID.1277.)[17]  Second, the jury's acquittals on the first-degree murder and conspiracy charges suggest that the prosecution would have had difficulty proving beyond a reasonable doubt that Janish did not kill Thomas in defense of Mercer. Here's how.  Mercer's and Janish's defenses to those charges rested in fairly large part on their statements to police investigators in which they denied having a plan to kill Hannah and Thomas.  Indeed, Mercer's counsel told the jury in his closing on behalf of Mercer: "If you think that there was ever a plan to do anything other than scare [Hannah and Thomas,] [w]atch the tapes [of the statements by Janish and Mercer to investigators], watch the videos[.]" (6/15/2012 Tr., ECF No. 7-10,

---

[17] On the page of the transcript cited above, the prosecutor was discussing a self-defense instruction rather than a defense-of-others instruction.  However, that does not make his observations any less relevant.  Both instructions require the prosecution to disprove the defense beyond a reasonable doubt. *See* Mich. Crim. JI 20 (self-defense instruction) and 7.21(6) (defense of others instruction).

PageID.1357.)  Thus, there is reason to believe that the statements by Mercer and Janish created (or at least substantially helped to create) reasonable doubt in the jurors' minds.  Critically, the defense that Janish killed Thomas in order to protect Mercer from being raped by Thomas also rested upon the statements by Mercer and Janish.  Since those statements appeared to have played a large role in creating reasonable doubt on the conspiracy and first-degree murder charges, there is reason to believe that those statements also would have created reasonable doubt on the question of whether Janish killed Thomas in defense of Mercer.

In sum, when the state trial court refused to give the Defense of Mercer Instruction, it not only eliminated a heavy burden from the prosecution, it eliminated a burden that the prosecution may well have been unable to satisfy.  In doing so, it rendered Mercer's trial on the second-degree murder charge related to Thomas' killing fundamentally unfair. *See Leffew*, --- N.W.2d ---, 2022 WL 246549, at **11–12, 13 (holding that absence of defense-of-others instruction prejudiced defendant because, among other things, the instruction would have "explain[ed] to the jury that the prosecution had to disprove that [the defendant] acted in defense of [a third party] beyond a reasonable doubt" and because the evidence included at least one "account[]" that supported the defense of others defense).

**ii**

The state trial court's refusal to give the Defense of Mercer Instruction also deprived Mercer of her only viable complete defense to the second-degree murder and manslaughter charges related to the killing of Thomas.  She had no other complete defense to those charges because she and Janish had effectively *admitted* the elements of those charges in their statements to police investigators.

As described above, in those statements they conceded that (1) they invited two notoriously-violent drug dealers over to Mercer's house with the intent that Janish would threaten and scare them with a firearm and (2) during the ensuing encounter, Janish killed Thomas.  Those admissions satisfied the two elements of second-degree murder that the state trial court identified in its second-degree instructions to the jury: (1) that Mercer and Janish caused Thomas' killing and (2) that they knowingly created a very high risk of death or great bodily harm knowing that death or great bodily harm would be the likely result of their actions. (*See* 6/15/2012 Tr., ECF No. 7-10, PageID.1397–1398.)  Indeed, the admissions were more than enough under Michigan law to establish the crime of second-degree murder. *See People v. McMullan*, 789 N.W.2d 857, 858 (Mich. 2010) (finding sufficient evidence to support second-degree murder conviction where defendant attempted to scare or threaten victim with a loaded gun and where defendant shot victim during ensuing encounter).  Moreover, because manslaughter is a lesser-

included offense of murder, *see People v. Mendoza*, 664 N.W.2d 685, 693 (Mich. 2003), and because certain aspects of the statements by Mercer and Janish described the "heat of passion" associated with manslaughter (see *infra* at Part (III)(G)(3)(b)), their statements were sufficient to establish their guilt for that offense too.

Under these circumstances, Mercer and Janish had only one viable path to acquittal on the homicide charges related to the killing of Thomas: to argue that the killing resulted not from their creation of a risk of death and/or from the "heat of passion," but, instead, from Thomas' intervening act of attempting to rape Mercer. When the state trial court refused to give the Defense of Mercer Instruction, it precluded Mercer from presenting that lone plausible complete defense. The refusal thus rendered her trial fundamentally unfair.

The Michigan Supreme Court's decision in *Leffew* in instructive in this regard. One of the defendants in *Leffew* was convicted of home invasion. *See Leffew*, --- N.W.2d ---, 2022 WL 246549, at *5. At his trial, he had "conceded the elements" of that charge but argued that he was nonetheless justified in committing the offense because he had acted to protect two other individuals. *Id.* at *14. The Michigan Supreme Court held that the defendant suffered prejudice from the lack of a defense-of-others instruction because, since the defendant had admitted the elements of the offense, it was "hard to imagine how a juror hearing the instructions could acquit" the defendant. *Id.* at *14. The same is true here. Mercer's trial, like the defendant's

trial in *Leffew*, was fundamentally unfair because, in light of the admissions by Mercer and Janish, it is nearly impossible to see how the jury could have acquitted Mercer of the killing of Thomas without the Defense of Mercer Instruction.

### iii

The United States Court of Appeals for the Second Circuit has twice held under similar circumstances that a state court's failure to instruct on a defense rendered a defendant's trial fundamentally unfair. Those decisions bolster this Court's conclusion that the state trial court's error here violated Mercer's right to due process.

In the first, *Davis*, 270 F.3d 111, a habeas petitioner challenged his manslaughter conviction by arguing that he was erroneously denied a justification instruction (*i.e.*, an instruction on self-defense). The petitioner admitted to shooting the victim (a man named "Bubblegum"). However, the petitioner testified at trial that Bubblegum had robbed him at gunpoint repeatedly in the past, had raped him a few months prior to the shooting, and (after raping petitioner) had said that he (Bubblegum) was going to kill the petitioner the next time they saw each other. *See id.* at 117–18. The petitioner explained that, on the day of the shooting, he incidentally encountered Bubblegum on the street for the first time since the rape. *See id.* at 118. The petitioner then testified that immediately after the two noticed each other, he attempted to evade Bubblegum and obtained a gun for his protection.

*See id.*  However, Bubblegum tracked the petitioner down. *See id.*  The petitioner

testified that as Bubblegum approached him, he (the petitioner) felt trapped and

believed that Bubblegum was about to shoot him. *See id.* at 119–20.  The petitioner

testified that he therefore shot Bubblegum first, "hoping to 'beat [Bubblegum] to the

draw[.]'" *Id.* at 120.   Despite the petitioner's testimony (and other supporting

evidence), the state trial court refused to provide a justification instruction. *See id.*

The petitioner was convicted, and New York's Appellate Division affirmed. *See id.*

at 120–21.

On habeas review, the Second Circuit held that the state court violated

petitioner's due process rights by failing to instruct the jury that justification was a

defense to the charge of homicide.  In a passage (worth quoting at length) that fits

Mercer's case like a glove, the court explained why the refusal rendered the trial

fundamentally unfair:

> Under the circumstances of this case, the trial court's
> ruling completely deprived Davis of his highly credible
> defense to the homicide charge and guaranteed his
> conviction. In his testimony, Davis had confessed to
> intentionally shooting Bubblegum. Without an instruction
> on the justification defense, the question whether he was
> guilty of the homicide was thus open and shut. On the
> other hand, if the trial court had not ruled justification out
> of the case, Davis had a compelling defense for the jury to
> consider—on which the People had bore the burden of
> proof. The evidence on the issue was quite favorable to
> Davis. And the jury, by ruling in Davis's favor on the
> question of extreme emotional disturbance, showed that it
> generally      accepted      the      truthfulness      of      Davis's

testimony. Taking all this into account, there is a substantial likelihood that a properly instructed jury would have found in Davis's favor on the homicide charge.

This case is markedly different from *Blazic,* 900 F.2d at 541–43. In *Blazic* we denied habeas relief where the petitioner was erroneously deprived of a justification charge. We did so because we found the denial would not have influenced the jury's verdict. Blazic's principal claim (to which he testified) was that the gun had gone off accidentally—a claim inconsistent with his subordinate claim of justified intentional use of deadly force. Because the jury was instructed extensively on intent in connection with Blazic's principal defense, and because the erroneous failure to instruct related only to Blazic's secondary defense (which was incompatible with his own testimony), we concluded that the failure to instruct did not affect the jury's deliberations and that the error therefore did not infect the trial in the manner contemplated by *Cupp* as required for relief on habeas review. *See id.*

Here, in contrast, the error was of immense importance. This is not a case of a minor error of state law in explaining the legal standards to the jury. It is not a case of a refusal to instruct on a fantastic, improbable defense that the jury was unlikely to adopt. Nor was the absence of an instruction on justification mitigated by other portions of the charge. […]

The effects of the court's error were to deprive Davis entirely of his defense—on which he had a significant possibility of prevailing—and to insure his conviction. The effect of the error was catastrophic.

\* \* \*

We are confident that this error had such enormous practical importance for Davis's conviction on the homicide charge that it must be considered a violation of due process. The error seriously infected "the entire trial,"

71

> so that its result cannot be considered fair.
> The *Cupp* standard was satisfied.

*Id.* at 131–33 (footnotes omitted).  Here, just as in *Davis*, the state trial court's refusal

to give the Defense of Mercer Instruction "was of immense importance," because

the Defense of Mercer Defense, as reflected in that instruction, (1) was supported by

evidence that appeared to create reasonable doubt on a separate charge; (2) was

Mercer's only viable complete defense to the charge for which she was convicted;

and (3) had to be disproved beyond a reasonable doubt.

Second, the court reached the same conclusion in *Jackson. See Jackson*, 404

F.3d at 625.  In that case, a habeas petitioner, an apartment superintendent, had shot

the victim during a heated argument over access to a vacant apartment. *See id.* at

615–16.  The petitioner confessed to shooting the victim. *See id.* at 616.  But, he told

police that he did not remember aiming his gun at the victim, and that the shooting

occurred after the victim punched him twice and knocked him down. *See id.* at 617.

Other eyewitnesses disputed the petitioner's claim that there was a physical

altercation. *See id.* at 616.  The petitioner was then charged with, *inter alia*, second-

degree murder. *See id.* at 617.

The state trial court declined to instruct the jury that the shooting was justified

if committed in self-defense. *See id.*  Unable to argue justification, the petitioner

argued he shot the victim accidentally. *See id.*  The jury acquitted him of second-

degree murder but convicted him of second-degree manslaughter. *See id.*  On habeas

review, the petitioner argued the state trial court's refusal to give a justification instruction violated his due process right to present a defense. *See id.* at 618.

The Second Circuit agreed. *See id.* It held that the petitioner's acquittal for second-degree murder, and conviction of a lesser offense, indicated that "the jury was, in fact, open to crediting [the petitioner's] version of events." *Id.* at 625. The court noted there were "ample grounds" from the petitioner's videotaped confession and other witnesses' testimony and statements "for a jury to credit [the petitioner's] justification defense." *Id.* at 626. Thus, the court held the state trial court's refusal to provide a justification instruction barred the petitioner from raising a viable and complete defense, which the court noted was "nothing short of a catastrophic error." *Id* at 625 (internal quotation marks omitted).

The same is true here. The jury's verdicts on the first-degree murder and conspiracy charges indicate that the jury was open to crediting the statements by Mercer and Janish (or, at least, that the jury was open to considering whether those statements created reasonable doubt as to the truth of the allegations against Mercer and Janish), and the statements by Mercer and Janish provided more than enough evidence to support the Defense of Mercer Defense. Thus, as in *Jackson*, the failure to give the Defense of Mercer Instruction deprived Mercer of due process of law. *See also Means*, 646 F.2d at 331–32 (holding that failure to give self-defense instruction deprived habeas petitioner of due process of law).

**3**

For all of the reasons explained above, Mercer has satisfied all of the elements of the *Davis* test for determining when a trial court's failure to instruct on a defense amounts to a due process violation.   Having established that a constitutional violation likely led to her conviction for the second-degree murder of Thomas, Mercer is entitled to habeas relief from that conviction.

**F**

Respondent offers a number of counterarguments as to why Mercer is not entitled to relief.   None persuade the Court that Mercer's conviction for Thomas' murder may stand.

**1**

First, Respondent asserts that Mercer was not entitled to the Defense of Mercer Instruction because she "did not kill anyone trying to defend anyone." (Resp., ECF No. 9, PageID.1876; First Supp. Resp., ECF No. 21, PageID.1982.) This argument rests upon a misunderstanding of Michigan law.   As described in detail above in Part (III)(E)(2)(a), the Defense of Mercer Defense was fully available to Mercer.   Even the state trial court eventually seemed to recognize that point – albeit after the trial concluded. (*See* 4/22/2014 Hr'g Tr., ECF No. 7-14, PageID.1482 ("[I]f somehow Janish had been found not guilty based on a defense of others, there's no way that Ms. Mercer could then be found guilty. Or, if the jury had made an

inconsistent verdict, at that point then I could have always set it aside.").)  In short, Respondent cannot excuse the state trial court's failure to give the Defense of Mercer Instruction on the ground that Mercer was not the person who claimed to act in defense of another.

## 2

Second, Respondent says that Mercer was not entitled to the Defense of Mercer Instruction because "her defense had nothing to do with 'defense of others.'" (Resp., ECF No. 9, PageID.1875.)  But in post-trial proceedings, the prosecutor took a different view.  He recognized that one of Mercer's "defense[s]" to the killing of Thomas was "that Janish came in and shot Thomas while Thomas was trying to rape Mercer." (4/22/2014 Hr'g Tr., ECF No. 7-14, PageID.1465.)  That *is* the Defense of Mercer Defense.[18]

Moreover, the trial record belies Respondent's contention that Mercer's defense had "nothing" to do with defense of others.  While much of Mercer's defense

_____

[18] Mercer's counsel agreed with the prosecutor that Mercer offered this defense to the killing of Thomas. (*See* 4/22/2014 Hr'g Tr., ECF No. 7-14, PageID.1465).  He also recognized that Mercer could not have been convicted of aiding and abetting the murder of Thomas if Janish killed Thomas to defend Mercer against a rape. (*See id.*, PageID.1462.)  But he admittedly expressed some confusion as to how a defense of others instruction applied to Mercer personally given that Mercer did not fire the shot that killed Thomas and did not act to defend anyone else. (*See id.*, PageID.1465).  Despite that confusion (and as noted above), Mercer's counsel says that he asked for the Defense of Mercer Instruction during the in-chambers conference with the trial court. (*See id.*, PageID.1470.)

focused on negating the prosecution's contention that she planned the killings of Thomas and Hannah, her attorney did make an effort to justify the killing of Thomas as necessary to protect Mercer from Thomas.  In fact, he introduced the defense-of-others concept in his very first interaction with the jurors – during *voir dire*.  He asked the members of the venire whether they believed in "the right to defend the people whom we love[.]" (6/11/2012 Tr., ECF No. 7-6, PageID.538.)  Then, during his closing argument he highlighted Thomas' "reputation for […] violence." (6/15/2012 Tr., ECF No. 7-10, PageID.1351.)  Finally (and most importantly), he echoed and built upon the contention by Janish's counsel (in his closing) that Thomas posed an immediate threat to Mercer when Janish shot Thomas.  He argued that "[w]hen [Thomas] walked in that bedroom where [Mercer] was he didn't have to holler or shout, his presence, the threat was already made, his presence." (*Id.*, PageID.1356.)  These examples show the error in Respondent's contention that Mercer's defense had "nothing" to do with defense of others.

Mercer's counsel can hardly be faulted for not making more of the Defense of Mercer Defense.  Indeed, the state trial court precluded the jury from considering that defense when it declined to give the Defense of Mercer Instruction.  Thus, arguing the defense would not have been a viable path to acquittal. *See Jackson*, 404 F. 3d at 617 (holding that trial court's refusal to instruct on justification defense violated defendant's right to due process even though defendant presented different

defense to jury after trial court refused to instruct on justification). Furthermore, if Mercer's counsel had further highlighted this legally unavailable defense, he would have run the risk of distracting the jury from Mercer's other available defenses to the conspiracy and first-degree murder charges. Finally, Janish's counsel highlighted the facts underlying this defense to the jury, and Mercer's counsel thus had no need to rehash them again in detail during his presentation. For all of these reasons, the Court declines to withhold relief on the basis that Mercer's counsel failed to more prominently feature the Defense of Mercer Defense in his presentation to the jury.

### 3

Third, Respondent appears to suggest that Mercer is not entitled to relief because her attorney did not object to the lack of the Defense of Mercer Instruction. The Court disagrees.

As an initial matter, Respondent waived his right to assert procedural defenses like this one when he pleaded in his Answer that none of Mercer's claims were barred by a procedural default. The Court will not permit Respondent to resuscitate his waived procedural defenses to Mercer's claim at this point in the proceedings.

Next (and in any event), there is evidence in the record that Mercer's counsel did request the Defense of Mercer Instruction and that the state trial court rejected that request. As noted above, Mercer's counsel testified under oath that he believed

he requested the Defense of Mercer Instruction during a conference with the trial judge in chambers and that the judge refused to give the instruction. (*See* 4/22/2014 Hr'g Tr., ECF No. 7-14, PageID.1470.)   The trial judge and prosecutor did not disagree with that testimony when Mercer's counsel offered it.   So, while Mercer's counsel may not have formally objected to the lack of the Defense of Mercer Instruction on the record, there is evidence that he did ask the state trial court to give that instruction.

Furthermore, the record indicates that a formal objection to the lack of the Defense of Mercer Instruction by Mercer would have been futile, and that is yet another reason not to withhold relief based upon the absence of such an objection. Indeed, the trial court refused to give the instruction at least three times – when Janish's lawyer requested in it chambers and then again on the record, and when Mercer's counsel joined in the request in chambers.   It is thus clear that an additional, formal objection by Mercer would have met the same fate.   The absence of an additional futile objection by Mercer does not preclude relief here. *Cf. Osborne v. Ohio*, 495 U.S. 103, 124 (1990) (deciding challenge to omission of a jury instruction even though defendant did not object to the absence of the instruction and explaining that earlier ruling of trial court made clear that objection to lack of instruction would have been futile); *People v. Spencer*, 343 N.W.2d 607, 611 (Mich. Ct. App. 1983) (where defense counsel failed to request a curative jury instruction that may have

eliminated prejudice from error, court nonetheless proceeded to review and grant relief based upon the error because, among other things, "[g]iven the position taken by the trial judge, any request for a cautionary instruction would have been futile.").

Finally, the lack of a formal objection by Mercer does not negate the state trial court's obvious substantive error in refusing to give the Defense of Mercer Instruction. The formal request for the instruction by Janish's counsel squarely placed before the state trial court the issue of whether the instruction should be given, and (for all of the reasons explained above) the state trial court had a clear duty to give the instruction in response to that request. Thus, this is not a case in which Mercer is complaining that the state trial court erred by failing *sua sponte* to instruct on an available defense. Moreover, the state trial court's wrongful refusal to give the instruction directly impacted Mercer because (as further explained above) the defense reflected in the instruction fully applied to her. For all of these reasons, the Court declines to hold that the absence of a formal objection by Mercer's counsel to the lack of the Defense of Mercer Instruction precludes Mercer from obtaining relief on her due process claim here.

## G

Finally, the Court addresses whether, under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the error here was harmless. The Court concludes that it was not.

79

**1**

The *Brecht* test for harmless error "ask[s] whether the error 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (quoting *Brecht*, 507 U.S. at 623). "The burden for showing an error to be harmless is on the government, though on habeas review judges independently review the facts supporting the judgment themselves; but the scale, if equal, tips in favor of the defendant." *Id.* at 413 (internal citations omitted).

**2**

In this Opinion and Order, particularly in Part (III)(E)(2)(b) above, the Court has explained in detail how state trial court's the refusal to provide the Defense of Mercer Instruction rendered Mercer's trial on the second-degree murder charge related to the killing of Thomas fundamentally unfair. For all of those reasons, the error here cannot be deemed harmless.

**3**

Respondent counters that the failure to give the Defense of Mercer Instruction was harmless under *Brecht* for two reasons. Neither persuades the Court that the error did not have a substantial and injurious effect on the verdict.

**a**

Respondent first argues that because the jury rejected the defense that Janish killed Hannah in self-defense, the jury surely would have rejected the Defense of Mercer Defense as a defense to the killing of Thomas.  In Respondent's words: "If Janish did not kill Hannah out of self-defense, then he most likely did not kill Thomas out of defending Mercer against rape." (First Supp. Br., ECF No. 21, PageID.1987.)

While Respondent's argument may have some intuitive force, it flows from an implicit premise that the jury rejected: namely, that the killings were part of a single, premediated plan.  Since the jury was not convinced that the killings were part of a single, overarching conspiracy, it does not follow that the jury necessarily would have rejected the Defense of Mercer Defense with respect to the Thomas killing simply because it rejected Janish's self-defense defense to the Hannah killing. In fact, the record confirms that the jury evaluated each of the killings separately.  It convicted Janish of different crimes for each killing.   It found him guilty of manslaughter for the killing of Hannah and guilty of second-degree murder for the killing of Thomas.

Had the jury received the Defense of Mercer Instruction, it may well have accepted the Defense of Mercer Defense even though it did not accept the self-defense defense with respect to the killing of Hannah.  Indeed, the Defense of Mercer

Defense was supported by *more* evidence that the self-defense defense with respect to the killing of Hannah. The Defense of Mercer Defense rested upon statements by *both* Mercer *and* Janish, whereas Janish's self-defense theory rested upon Janish's statement alone.[19] The statements of both Mercer and Janish, together, may well have been enough to create reasonable doubt as to whether Janish killed Thomas to stave off a rape – just as those statements, together, helped to create reasonable doubt as to whether Mercer and Janish acted according to a plan (as described above).

For all of these reasons, the Court cannot conclude that the jury's rejection of the self-defense defense with respect to the killing of Hannah necessarily demonstrates that the jury would have rejected the Defense of Mercer Defense with respect to the killing of Thomas.

**b**

Respondent next argues that the jury's decision to convict Mercer of second-degree murder, rather than voluntary manslaughter, for the killing of Thomas shows

---

[19] Notably, while Janish's statement, standing alone, did not persuade the jury that he killed Hannah in self-defense, his statement did create at least some doubt in the jury's mind with respect to the killing of Hannah. As noted above, the jury acquitted Janish of the second-degree murder of Hannah and convicted Janish of manslaughter. The only evidence in the record that could possibly have pushed the jury from second-degree murder to manslaughter was Janish's account of his confrontation with Hannah. This indicates that Janish's statement did have evidentiary value for the defense. And, coupled with Mercer's statement, it may well have been sufficient to create reasonable doubt as to whether Janish killed Thomas to prevent him from raping Mercer.

that the refusal to give the Defense of Mercer Instruction was harmless.   This argument – which Respondent offered during the October 20, 2021 hearing – proceeds in several steps:

**Step 1**:   The Defense of Mercer Defense rested upon the statements that Mercer and Janish gave to police investigators describing the killing of Thomas.

**Step 2**:   Those statements were "more consistent" with the conclusion that the killing of Thomas constituted voluntary manslaughter – *i.e.*, a killing for which there is an adequate provocation such as "passion or anger," MI Crim. JI 16.9(1) – than with the conclusion that the killing constituted second-degree murder.

**Step 3**:   The jury convicted Mercer and Janish of second-degree murder rather than manslaughter.

**Step 4**:   Since (a) the jury did not convict on the charge that was most consistent with the statements of Mercer and Janish, and (b) the Defense of Mercer Defense rested upon those statements, then (c) there is no reason to believe that the jury would have accepted the Defense of Mercer defense if the trial court have the Defense of Mercer Instruction.

**Step 5**:   Therefore, the trial court's failure to give the Defense of Mercer Instruction was harmless.

This argument does not account for the fact that the jury would have weighed the statements of Mercer and Janish under a much different standard in the context of the Defense of Mercer Instruction than the jury weighed the statements in the

context of evaluating the manslaughter charge.  With respect to the manslaughter charge, the statements by Mercer and Janish were relevant to the issue of whether there was adequate "provocation" for the killing of Thomas.  Provocation, when present, "mitigate[s] a killing from murder to manslaughter." *People v. Tierney*, 703 N.W.2d 204, 223 (Mich. Ct. App. 2005).  In a homicide prosecution, "[p]rovocation, or the absence of provocation, is not an element of the prosecutor's case." *People v. Darden*, 585 N.W.2d 27, 31 (Mich. Ct. App. 1998).  Therefore, the prosecution "need not" prove the absence of provocation beyond a reasonable doubt to prove voluntary manslaughter. *Id*.  Instead, there must be an *affirmative* showing by sufficient evidence, and the jury must find, "that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *Mendoza*, 664 N.W.2d at 690.[20]  Thus, when a jury convicts on a charge of second-degree murder rather than voluntary manslaughter, the jury has determined that the evidence was not sufficient to support an *affirmative finding* that the killing was provoked.  In this case, then, the jury's decision to convict Mercer of second-degree murder rather than manslaughter shows only that the jury did not find the statements by Janish and

---

[20] In fact, the defendant bears the burden of proof to show provocation by a preponderance of the evidence. *Ruelas v. Wolfenbarger*, 580 F.3d 403, 413 (6th Cir. 2009) (applying Michigan law) ("[T]he burden of proof to show provocation, however, is on the defendant, and it must be shown by a preponderance of the evidence.") (citing *Darden*, 585 N.W.2d at 31).

Mercer persuasive enough to support an *affirmative finding* that there was adequate provocation for the killing of Thomas.

In sharp contrast, when weighing the statements by Janish and Mercer in the context of the Defense of Mercer Defense, the jury would not have been asked to determine whether the statements were strong enough to support an affirmative finding. Instead, under the Defense of Mercer Instruction, the jury would have been tasked with determining whether the statements created a reasonable doubt as to whether Janish killed Thomas to defend Mercer from a sexual assault. And the prosecution would have had the heavy burden of proving beyond a reasonable doubt that the statements did not show that Janish killed Thomas for that purpose.

Critically, even though the jury may have concluded that Mercer's and Janish's statements were not strong enough to support an affirmative finding of provocation, the jury may well have deemed the statements strong enough to create at least a reasonable doubt as to whether Janish killed Thomas to protect Mercer against a sexual assault. Indeed, as noted above, those statements appear to have contributed to the jury's reasonable doubt on another issue – the issue of whether Janish and Mercer acted according to a plan. It is thus fair to conclude that the jury may have found the statements strong enough to create a reasonable doubt on the question of whether Janish killed Thomas to protect Mercer from a sexual assault. For these reasons, it does not follow that the jury necessarily would have rejected

the Defense of Mercer Defense because it chose not to convict Mercer of manslaughter.

Moreover, Respondent's contention that the statements by Mercer and Janish were "more consistent" with manslaughter than with second-degree murder is open to serious debate. The difference between manslaughter and second-degree murder is "provocation" – which, as noted above, "mitigate[s] a killing from murder to manslaughter." *Tierney*, 703 N.W.2d at 223. As further noted above, "provocation" refers to the "heat of passion" that the defendant is unable to "control." *Mendoza*, 664 N.W.2d at 690. While some portions of Mercer's and Janish's statements may have been consistent with the notion that Janish killed Thomas in the heat of uncontrolled passion, other aspects of their statements – such as Mercer's claim that Janish did not shoot Thomas until Thomas refused his command to get off of Mercer – suggest that Janish decided to kill Thomas because he reasoned that it was necessary to do so to prevent him from raping Mercer. In short, there is a reasonable reading of their statements that is not consistent with manslaughter. Thus, it is quite possible that the jury *both* accepted the statements by Mercer and Janish *and* nonetheless concluded that manslaughter was not the right fit for the killing of Thomas. For this additional reason, the Court cannot confidently conclude that (1) the jury's decision to convict for second-degree murder rather than manslaughter shows that the jury rejected Mercer's and Janish's statements and (2) therefore, the

jury would have rejected the Defense of Mercer Defense – which rested upon those statements – if the trial court had given the Defense of Mercer Instruction.

For all of these reasons, the jury's decision not to convict Janish and Mercer of manslaughter does not establish that the trial court's refusal to give the Defense of Mercer Instruction was harmless.

## H

For the reasons stated above, the Court concludes the failure to provide the Defense of Mercer Instruction with respect to Thomas' death deprived Mercer of her due process right to present a defense, and the Court concludes that this constitutional error was not harmless.  Accordingly, Mercer is entitled to habeas relief on her due process claim.

But it not yet clear to the Court what the form and scope of that relief should be.  The failure to give the Defense of Mercer Instruction entitles Mercer to relief form her second-degree murder conviction and sentence arising out of the killing of Thomas (the killing to which the Instruction would have applied).  The much harder question is whether the state trial court's error also entitles Mercer to relief from her sentence (but not her conviction) for the second-degree murder of Hannah.  There is some indication in the record that the state trial court based its sentence for that offense, at least in part, upon the fact that Mercer had been convicted of *two* murders. (8/9/2012 Tr., ECF No. 7-13, PageID.1444.)  There thus appears that a case could

be made that Mercer's sentence for the murder of Hannah was tainted by her invalid conviction for the murder of Thomas. And there may be a further case to be made that under these circumstances, the Court can and should grant relief from Mercer's sentence for the murder of Hannah along with the relief from the conviction and sentence for the murder of Thomas.

The Court concludes that the most sensible way to proceed is to have the parties prepare a final round of supplemental briefs that addresses the scope-of-remedy issue. The Court will promptly convene a status conference with counsel to develop a plan for that supplemental briefing.

## IV

The Court next addresses Mercer's claim that her trial counsel's reliance on the legally inapplicable defense of duress deprived her of the effective assistance of counsel.

## A

The facts underlying this claim are as follows. At the beginning of the trial, Mercer's counsel, George D. Lyons, signaled his intention to rely on a duress defense. During *voir dire*, he explained this defense to the jury venire as follows:

> MR. LYONS: And I anticipate the Judge will read an instruction that goes to something called duress. What's duress? I'm sorry, I've been picking on all that back row but it's time to pick on you guys up front. Well, that's fair enough. Okay, that's kind of what I – that's – help me out, come on there. Let me – you like a Heimlich? Cough it up.

Is it when – when you're placed in a position to do something you would have ordinarily done by outside forces? That fair?

UNIDENTIFIED JUROR: That's fair.

MR. LYONS: Do we all understand that? And if the Judge should read you an instruction that says if persons do things, or are of such a reputation that they place you in a position to do things that you may find my client not guilty. Okay?

(6/11/2012 Tr., ECF No. 7-6, PageID.539.)

As predicted by Mercer's counsel, the state trial court provided a preliminary instruction on the duress defense once the jury was seated:

Now, each of the defendants say that he or she is not guilty because someone else's threatening behavior made him or her act as he or she did. This is called he defense of duress. The defendants are not guilty if he or she committed the crime under duress. Under the law there was duress if five things were true: One, the threatening behavior would have made a reasonable person fear death or serious bodily harm.

Two, the defendants actually were afraid of death or serious bodily harm.

Three, the defendants had this fear at the time he or she acted.

Four, the defendants committed the act to avoid the threatened harm.

Five, the situation did not arise because of the defendants fault or negligence.

Now, in deciding whether duress made the defendants act as he or she did think carefully about all the circumstances as shown by the evidence. Think about the nature of any

> force or threats, think about the background and character
> of the person who made the threats or used the force. Think
> about the defendant's situation when he or she committed
> the alleged act. Could he or she have avoided the harm he
> or she feared in some other way than by committing the
> act?
>
> Think about how reasonable these other means would
> have seemed to a person in the defendant's situation at the
> time of the alleged act.
>
> Now, the prosecutor must prove beyond a reasonable
> doubt the defendants were not acting under duress. If he
> fails to do so then you must find the defendants not guilty.

(*Id.*, PageID.716–717.)

Finally, Mercer's counsel once again raised the duress defense with the jury

in his opening statement:

> [Duress] says this, you put me in fear of harm and great
> bodily harm, me and my two year old child? What I do?
> How I respond is reasonable, and the prosecutor has to
> prove beyond a reasonable doubt that there was no duress.
> How he's going to do that is beyond me.

(*Id.*, PageID.758.)

After opening statements, the prosecutor informed the state trial court and

both defense counsel, out of the presence of the jury, that "duress […] has never

been a valid defense to homicide." (*Id.*, PageID.762.)   Mercer's counsel later

conceded that duress is not a defense to murder, though he insisted that it could be a

defense to conspiracy. (*See* 6/14/2012, ECF No. 7-9, PageID.1270.)  The state trial

court ultimately ruled that duress was not a valid defense to any of the charges

90

against Mercer, and the court informed counsel that it would not provide a duress

instruction in its final jury instructions. (*See id.*, PageID.1272.)  Mercer's counsel

never mentioned the duress defense to the jury again.

The prosecutor did address the defense with the jury later in the trial.  During

the prosecutor's closing argument to the jury, he told the jury that there was *shared*

responsibility for the erroneous references to the duress defense earlier in the trial:

> Now there are some issues that came up during the trial
> that the Judge will instruct you on. And one of the things
> I want to make sure you understand is that all of the
> attorneys in this case at the very beginning of this case and
> that includes the Judge, made a legal mistake. And that
> was initially advising you that duress was part of this case.
> One of the things the Judge is going to tell you is that *all
> of us, I, Mr. Lyons, Mr. Raduazo and the Judge himself
> mistakenly told you that duress was a defense in this case.*
>
> It is not. It never has been. And the Judge is going to
> instruct you that you cannot consider duress as part of your
> – part of your discussions in this case. It is an invalid
> defense in the context of this case.

(6/15/2012 Tr., ECF No. 7-10, PageID.1370 (emphasis added).)

## B

Mercer argues that her counsel's initial reliance on the duress defense

constituted ineffective assistance of counsel under the standards set forth in

*Strickland v. Washington*, 466 U.S. 668 (1984). (*See* First Supp. Br., ECF No. 20,

PageID.1974.)   Under *Strickland*, a criminal defendant claiming ineffective

assistance of counsel must show "both that counsel's performance was deficient,

measured by reference to an 'objective standard of reasonableness,' and resulting prejudice, which exists where 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Coleman*, 835 F.3d 606, 612 (6th Cir. 2016) (quoting *Strickland*, 466 U.S. at 688, 694) (internal citations omitted).   Mercer argues that her counsel's reliance on the duress defense satisfies *Strickland's* deficient performance prong because it was an obvious "mistake of black-letter law." (First Supp. Br., ECF No. 20, PageID.1974.)   Mercer further contends that her counsel's error caused her prejudice because he "lost all credibility with the jury when he relied on a defense in his opening that was inapplicable." (Second Supp. Br., ECF No. 28, PageID.2018.)

Mercer raised this claim on direct appeal, and the Michigan Court of Appeals rejected it.   That court held that Mercer was not entitled to relief because she failed to show that her counsel's invocation of the duress defense caused her prejudice:

> In this case, even absent the duress instruction, counsel employed a viable defense strategy when he advanced the theory that defendant was not guilty of murder or conspiracy beyond a reasonable doubt. In his opening statement, counsel argued that the victims posed a threat and claimed that defendant planned to scare the victims. He argued that defendant did not hold the gun or pull the trigger and was surprised when Janish killed the victims. During closing argument, counsel repeated the theme, claiming that the victims were dangerous drug dealers who posed a real threat. Counsel argued that defendant was guilty of "conspiring to scare" the victims. Counsel argued that defendant was surprised when

Janish killed the victims as evidenced by both defendants' statements to police that she "freaked out" after the shootings. Counsel reminded the jury that, despite the interrogations, defendant did not wavier on her insistence that she only intended to scare the victims and that Janish said the same thing. Counsel also noted that defendant did not even realize there was a dead man outside and he argued that it was reasonable for Janish to think that Hannah's cell phone was a weapon.

Considering that duress was only briefly mentioned at the start of the trial, and considering that counsel advanced an alternate theory during trial, we conclude that defendant has failed to show that, but for the duress instruction, the result of the proceeding would have been different.

*Mercer*, 2014 WL 4262998, at **14–15.

## C

Because the Michigan Court of Appeals decided Mercer's ineffective assistance claim on the merits, the claim is subject to review under AEDPA. And under AEDPA, this Court's review of the claim "must be doubly deferential." *Hendrix v. Palmer*, 893 F.3d 906, 921 (6th Cir. 2018) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "The question 'is not whether [this Court] believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles*, 556 U.S. at 123 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

**D**

Mercer argues that the Michigan Court of Appeals unreasonably applied *Strickland* when it concluded that her counsel's erroneous invocation of the duress defense did not prejudice her.  Mercer contends (as noted above) that the prejudice from her counsel's error was obvious because the error caused her counsel to lose "all credibility" with the jury. (Second Supp. Br., ECF No. 28, PageID.2018.)

The Michigan Court of Appeals' contrary conclusion was not unreasonable. As explained above, the prosecutor told the jury that *all* of the key non-party participants in the trial – i.e., *all* of the lawyers *and* the judge – were responsible for the erroneous references to the duress defense.  Given the prosecutor's effort to spread the blame for the mistaken invocation of the duress defense, it would not have been unreasonable for the Michigan Court of Appeals to have concluded that (1) Mercer's counsel did not suffer any unique loss of credibility from the mistaken references to the duress defense, (2) any loss of credibility would have been suffered equally by all of the lawyers and the state trial court, and (3) Mercer therefore did not suffer prejudice as a result of her counsel's mistaken invocation of the duress defense.  Accordingly, AEDPA bars Mercer's claim for relief based upon ineffective assistance of counsel.

**V**

**A**

The Court next turns to Mercer's prosecutorial misconduct claim.  Mercer

argues that the prosecutor deprived her of a fair trial when he repeatedly misinformed

the jury during his rebuttal argument that the exculpatory portions of the statements

that Mercer and Janish made to police investigators were "inherently unbelievable."

(First Supp. Br., ECF No. 20, PageID.1975–1977.)

The Supreme Court's decision in *Darden v. Wainright*, 477 U.S. 168 (1986),

establishes the standard for evaluating claims of prosecutorial misconduct.  Under

*Darden*, a prosecutor's misconduct deprives a criminal defendant of due process of

law where it "so infect[s] the trial with unfairness as to make the resulting conviction

a denial of due process." *Id.* at 169.  *Darden* therefore sets a "high bar" for relief.

*Stewart v. Trierweiler*, 867 F.3d 633, 639 (6th Cir. 2017).

Mercer argues that the prosecutor's misstatements of law concerning the

purported unreliability of her statements to the police so undermined the fairness of

her trial as to satisfy the *Darden* standard:

> [T]hese prosecutorial statements distracted the jury and
> affected the fairness of the trial. In a case so dependent
> upon the credibility of the defendants' admittedly self-
> serving statements, it is difficult to imagine a more
> harmful type of prosecutorial misconduct. The prosecutor
> intentionally injected his erroneous and damaging view of
> the law, and hammered home its application to the facts of
> the case. Even the timing could not have been worse, since

this poison was planted in the jurors' ears during rebuttal – when there was no opportunity for the defense to respond.

With that, the prosecutor stripped the jury of the last possible means it could have used to acquit Mercer. The jurors had already been told not to consider the previously promised defense of duress. They were never made aware of the defense of others. Now, moments before deliberation, they were instructed by the prosecutor to disregard the most important evidence lying at the heart of Mercer's botched defense – her and Janish's own statements. Since the jury was improperly instructed in extraordinarily significant ways (See Issue I and Issue II, supra), these prosecutorial remarks are even more likely to have swayed the jury and "infected the trial with unfairness." *Donnelly*, *supra*, 416 U.S. at 643.

(First Supp. Br., ECF No. 20, PageID.1976–1977.)

## B

Mercer raised this claim on direct appeal, and the Michigan Court of Appeals rejected it:

> "[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *Dobek,* 274 Mich.App at 63. "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id.* at 64. This Court will not find error requiring reversal "where a curative instruction could have alleviated any prejudicial effect" of the statements. *Unger,* 278 Mich.App at 235 (quotation omitted). "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements ... and jurors are presumed to follow their instructions." *Id.*

> During rebuttal argument, the prosecutor stated as follows:

96

> [Y]ou've all heard about hearsay ... [T]here's a number of exceptions to the hearsay rule. [The exceptions are] based on the concept that if a defendant says something that hurts him it's inherently believable and therefore it's admissible ... If they say something that favors them it's inherently unbelievable and it's ... barred by hearsay.

Defense counsel objected, and the trial court instructed the jury that "[t]he hearsay rule is an extremely complicated rule of many parts." The prosecutor continued, arguing that defendant's theory that she intended to scare the victims was "inherently unbelievable ." The prosecutor argued that both Janish and defendant admitted to the contents of the phone call to Hannah, therefore it was "inherently believable" because it could be used against defendant.

The prosecutor acted inappropriately when he argued that admissions of a party opponent were "inherently believable." There is nothing in MRE 801(d)(2), (admission of a party opponent), that states that admissions are inherently believable and the prosecutor should not have attempted to explain to a lay jury the academic reasoning underlying the evidentiary rule. Nevertheless, the statement did not deny defendant a fair trial. The prosecutor's statements were isolated and the crux of the statements concerned the credibility of defendant and Janish's assertions that they intended to scare the victims. See *People v. Buckley,* 424 Mich. 1, 14–15; 378 NW2d 432 (1985) (a prosecutor may comment on a defendant's credibility).

Furthermore, the trial court provided sufficient instructions in this case. *Unger,* 278 Mich.App at 235. Specifically, the court instructed the jury that the hearsay rule was "extremely complicated" with "many parts," that the statements and arguments of the lawyers were not evidence that the jury was to determine what each piece of evidence means, that the jury was the only judge of the

> facts, and that the jury was to give defendants' statements "whatever weight you think the statements deserve." The trial court properly instructed the jury that it was the trier of fact and that the prosecutor's statement was not evidence and jurors are presumed to follow their instructions. *Id.* Defendant was not denied a fair trial.

*Mercer*, 2014 WL 4262998, at *15.

## C

Because the Michigan Court of Appeals decided Mercer's prosecutorial misconduct claim on the merits, the claim is subject to review under AEDPA. And under AEDPA, Mercer is entitled to relief only if she "establish[es] that the [Michigan Court of Appeals'] rejection of the *Darden* prosecutorial misconduct claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In making that assessment, the Court must be mindful that "the *Darden* standard is a very general one, leaving courts 'more leeway […] in reaching outcomes in case-by-case determinations.'" *Id.* at 48 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

While the Court strongly disapproves of the prosecutor's misstatement of Michigan law, and while the Court may well have voted to grant relief on Mercer's prosecutorial misconduct claim if the Court had reviewed the claim on direct appeal, the Court cannot conclude, under the especially deferential standard of review that

applies here, that the Michigan Court of Appeals' rejection of the claim was unreasonable.  A fairminded jurist could conclude, for the reasons given by the Michigan Court of Appeals, that although the prosecutor's misstatement of the law was improper, the misstatement did not so infect the trial with unfairness as to rise to the level of a due process violation.

Moreover, there is reason to believe that the prosecutor's misstatement of the law did not have the devastating effect that Mercer believes it had.  The prosecutor's misstatements were aimed at discrediting the exculpatory portions of the statements that Mercer and Janish gave to police investigators.  But as described above, in Part (III)(E)(2)(b)(i), it does not appear that the jury rejected those portions of the statements.  As discussed there, counsel for Mercer and Janish argued to the jury that those portions of the statements showed that Mercer and Janish neither planned nor agreed to kill Hannah and Thomas, and the jury acquitted Mercer and Janish on the two charges that involved the alleged plan and agreement.  Simply put, the jury's verdicts were, in large measure, *consistent* with the portions of the statements by Mercer and Janish that the prosecutor sought to discredit through his misstatement of the law.  Under these circumstances, the Michigan Court of Appeals could reasonably have concluded that the prosecutor's improper attack on the portions of the statements by Mercer and Janish did not succeed and that, for that additional reason, the prosecutor's misconduct did not end up denying Mercer a fair trial.

For all of these reasons, the Court concludes that it cannot grant Mercer relief on her claim of prosecutorial misconduct.

## VI

The Court turns next to the three claims that were presented in Mercer's original petition, but that were not addressed by Mercer's appointed counsel in the supplemental briefs they filed on her behalf.

## A

The Court begins with Mercer's claim arising out of the admission of Janish's confession at trial.  Mercer argues that the admission of that confession denied her a fair trial, violated hearsay rules, and violated her right to confrontation.  She further insists that her trial counsel was ineffective for failing to move for separate trials and failing to object to admission of Janish's confession.

Mercer raised these claims on direct appeal, and the Michigan Court of Appeals rejected them.  That court noted that Mercer's counsel concluded that "the best trial strategy was to admit Janish's confession into evidence to show that defendant did not kill the victims." *Mercer*, 2014 WL 4262998, at *9.  The court explained that by pursuing this strategy, Mercer's counsel "effectively waived defendant's right of confrontation, any objection defendant may have had under the hearsay rule, and any objection to a joint trial." *Id.*  Thus, the court denied relief on those theories.  The court also rejected Mercer's theory that counsel was ineffective

for facilitating the admission of Janish's statement. *See id.* at *10. The court explained that portions of Janish's statement were exculpatory and supportive of the defense theories that Mercer wished to raise, and the court concluded that it was not unreasonable for Mercer's counsel to have concluded that the benefits of admitting Janish's statement outweighed the harm from doing so. *See id.*

The Court concludes that the Michigan Court of Appeals' decision was not an unreasonable application of clearly-established federal law. The Court agrees with the Michigan Court of Appeals that substantial portions of Janish's confession were exculpatory to Mercer and that Mercer's trial counsel could reasonably have chosen to admit the confession. It was therefore not unreasonable for the Michigan Court of Appeals to find that Mercer therefore waived any objections to the admission of the confession, nor was it unreasonable for that court to reject Mercer's related ineffective assistance claim.

## B

The Court turns next to Mercer's claim that her statements to police investigators were involuntary because the investigators threatened her with federal prosecution and the death penalty. She also claims that her trial counsel was ineffective for failing to object to the admission of these statements.

Mercer raised these claims on direct appeal, and the Michigan Court of Appeals rejected them:

Defendant voluntarily appeared for her initial interview with police, but she appears to have been taken into police custody at or near the end of that interview. However, the analysis is the same because a noncustodial interrogation may, in some circumstances, give rise to an involuntary statement. *Beckwith v. United States,* 425 U.S. 341, 347–348; 96 S Ct 1612; 48 L.Ed.2d 1 (1976). Whether a statement is voluntary "is determined by examining the totality of the circumstances surrounding the interrogation." *People v. Gipson,* 287 Mich.App 261, 265; 787 NW2d 126 (2010). In determining whether a statement was voluntary, a court should consider the following non-exclusive factors:

> [1] the age of the accused; [2] his lack of education or his intelligence level; [3] the extent of his previous experience with the police; [4] the repeated and prolonged nature of the questioning; [5] the length of the detention of the accused before he gave the statement in question; [6] the lack of any advice to the accused of his constitutional rights; [7] whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; [8] whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; [9] whether the accused was deprived of food, sleep, or medical attention; [10] whether the accused was physically abused; and [11] whether the suspect was threatened with abuse. [*People v. Cipriano,* 431 Mich. 315, 334; 429 NW2d 781 (1988).]

No single factor is determinative and the inquiry turns on the totality of the circumstances. *Id.*

In this case, defendant voluntarily appeared for her initial interview with police. Police informed her that she was free to leave. When defendant was evasive in responding to several questions, one of the detectives stated:

> Here's where I'm at, okay? I've got the FBI
> breathing down my neck that they want to
> take over this case. You don't want that,
> okay?
>
> * * *
>
> Well, here's the whole thing. FBI gets a hold
> of this case, it possibly brings along with it
> the death penalty. You don't want that either.
> Okay? You need to tell us what happened so
> at least we can get them out of this, so we can
> keep it, you know, here in Jackson.

Thereafter, as discussed above, defendant made some incriminating statements, but she did not admit to killing the victims or to asking Janish to kill the victims. Instead, defendant maintained that her intent was for Janish to scare the victims. Defendant cannot show that police reference to the death penalty amounted to undue coercion. As the Sixth Circuit Court of Appeals has explained, "police can inform a suspect about the potential legal consequences of his crime ... or even promise that, by cooperating, a suspect can avoid the death penalty ... without engaging in behavior that is so inherently coercive as to render a suspect's subsequent confession involuntary." *McKinney v. Ludwick,* 649 F 3d 484, 491–492 (CA 6, 2011).

Furthermore, the totality of the circumstances shows that defendant's statements were voluntarily made. Defendant voluntarily appeared for the first interview and police informed her that she was free to leave. Defendant was 21 years old and had a 10th—grade education. She had some prior experience with the justice system as she had a juvenile record of four prior misdemeanors and she previously was arrested for failure to pay child support. Defendant was advised of her rights shortly after she voluntarily appeared for the first interview and defendant waived those rights. When police commenced their second interview with defendant—sometime later that day-police

103

re-advised defendant of her rights and defendant again agreed to speak with police. Defendant's interrogation was not lengthy and it appears to have been completed in the course of a couple hours. Defendant was not physically restrained. She did not indicate that she was under the influence of drugs or alcohol. She did not indicate that she was sleep-deprived or lacked nourishment and police offered her water. Defendant did not ask to use a restroom. Police did not physically harm defendant or threaten her with physical harm. Police made arrangements for defendant's son and they agreed to call the person of defendant's choice to take care of her son.

In short, the totality of the circumstances supports that defendant's statements were freely and voluntarily made and the trial court did not err in admitting the statements at trial. *Cipriano,* 431 Mich. at 334. For the same reason, defense counsel was not ineffective for failing to object to admission of the statements. See *Ericksen,* 288 Mich.App at 201 (counsel is not ineffective for failing to raise a futile objection).

*Mercer*, 2014 WL 4262998, at **12–13.

Mercer has not persuaded the Court that this decision involved an unreasonable application of clearly-established federal law. She has not demonstrated that the decision contravened any United States Supreme Court precedent. Moreover, the Sixth Circuit has held that a similar decision by a state court did not run afoul of clearly established federal law. *See McKinney v. Ludwick,* 649 F 3d 484, 491–92 (6th Cir. 2011) (holding that state court did not unreasonably apply clearly-established federal law when it allowed admission of a statement made by a defendant after police told defendant that he could face the death penalty if he

104

did not cooperate).  Finally, it was not unreasonable for the state appellate court to

hold that Mercer's trial counsel was not ineffective in failing to raise would have

been likely a futile objection to the admission of Mercer's statements.

**C**

Finally, the Court turns to Mercer's claim that her life sentences were,

alternatively, (1) invalid because the sentencing court presumed she was guilty of

premeditated first-degree murder, of which she was acquitted; or (2)

disproportionate such as to amount to cruel and unusual punishment.

Mercer raised these arguments on direct appeal.  The Michigan Court of

Appeals rejected both arguments:

> Defendant's recommended minimum sentencing range
> under the guidelines was 225 months to 375 months or life
> imprisonment. *See* MCL 777.61 (Sentencing Grid for
> Class M2 with a PRV Level C and an OV Level III is 225
> months to 375 months or life). The trial court sentenced
> defendant to two life sentences. The court stated:
>
>> I'm considering punishment, rehabilitation,
>> deterrence and the protection of society. Ms.
>> Mercer, even though you didn't pull the
>> trigger here your actions in this particular
>> matter make you just as guilty, if not more
>> guilty.
>>
>> Even though you didn't pull the trigger you
>> set everything up. You're the drug addict in
>> this matter that caused all these problems. As
>> a result of this ... their families will never see
>> them again ... The impacts you had on their

105

> lives, your family's lives ... all over $150 worth of drugs.
>
> * * *
>
> [ ][Y]ou could have resolved this instead of setting a trap, creating a situation where you brought them over and basically had Mr. Janish shoot them.

"A sentence is invalid when it is based on improper assumptions of guilt." *People v. Golba,* 273 Mich.App 603, 614; 729 NW2d 916 (2007). However, in fashioning a sentence within limits fixed by law, "[a] trial court may consider facts concerning uncharged offenses ... and even acquittals, provided that the defendant is afforded the opportunity to challenge the information and, if challenged, it is substantiated by a preponderance of the evidence." *Id.*

In this case, the trial court did not sentence defendant based on improper assumptions of guilt. Rather, the court considered information that defendant had an opportunity to challenge at trial that was substantiated by a preponderance of the evidence. Specifically, the court focused on the fact that defendant was found guilty of murdering two individuals and the devastating impact of her crimes. The court did not indicate that defendant was guilty of first-degree murder and instead it considered that defendant called the victims over to her house where they were shot. This fact was supported by evidence introduced at trial. Specifically, defendant admitted to police that she called the victims to her home and other evidence showed that defendant's telephone connected with one of the victims' cellular telephone minutes before he was shot. The court did not err in considering that evidence. *Id.*

Defendant separately argues that her sentence was disproportionate and amounted to cruel and unusual punishment in violation of the state and federal constitution.

"Although MCL 769.34(10) provides that a sentence within the guidelines range must be affirmed on appeal unless the trial court erred in scoring the guidelines or relied on inaccurate information, this limitation on review is not applicable to claims of constitutional error." *People v. Powell,* 278 Mich.App 318, 323; 750 NW2d 607 (2008). "However, a sentence within the guidelines range is presumptively proportionate ... and a sentence that is proportionate is not cruel or unusual punishment." *Id.* (citations omitted). To overcome the presumption of proportionality, "a defendant must present unusual circumstances that would render the ... sentence disproportionate." *People v. Lee,* 243 Mich.App 163, 187; 622 NW2d 71 (2000).

Here, defendant's sentence fell within the guidelines and she cannot overcome the presumption that the sentence was proportionate. *Id.* Defendant does not present any unusual circumstances to show that her sentence was disproportionate. Defendant argues that her young age, lack of a criminal record, and her family circumstances render her sentence disproportionate. However, these factors were considered in scoring the offense and prior record variables under the sentencing guidelines. They do not constitute unusual circumstance that render defendant's sentence disproportionate. Here, defendant was 21–years–old when she committed the crimes. Despite her family circumstances, the jury found that defendant murdered two individuals and her life sentence was authorized by law and fell within the recommended sentencing range. She has failed to overcome the presumption that her sentence was proportionate. *Powell,* 278 Mich.App at 323. Resentencing is not warranted.

*Mercer*, 2014 WL 4262998, at **16–17.

The Court concludes that it cannot grant relief on either of Mercer's challenges to her sentences.  As to Mercer's first challenge, the Michigan Court of

Appeals' determination that the state trial court "did not sentence defendant based on improper assumptions of guilt" was not unreasonable. *Id.* at *16.  The Michigan Court of Appeals noted that "the [state trial] court focused on the fact that defendant was found guilty of murdering two individuals and the devastating impact of her crimes" and that the state trial court "did not indicate that defendant was guilty of first-degree murder and instead it considered that defendant called the victims over to her house where they were shot," a "fact [that] was supported by evidence introduced at trial." *Id.*   This Court cannot find that line of reasoning to be unreasonable so as to warrant relief under AEDPA.[21]

Likewise, for Mercer's second claim, the Michigan Court of Appeals was not unreasonable when it concluded that Mercer's sentence was proportionate.  The United States Supreme Court has explained that the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Graham v. Florida*, 560 U.S. 48, 60 (2010), as modified (July 6, 2010) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1000–01 (1991) (KENNEDY, J., concurring in part and

---

[21] While the Court cannot find this line of reasoning to be unreasonable – a high standard under AEDPA – the Court believes that the state trial court did erroneously sentence Mercer based upon its improper conclusion that she had planned the killings and was thus guilty of first-degree murder.  At sentencing, the state trial court explained its view that Mercer "set[] a trap, creating a situation where you brought them over and basically had Mr. Janish shoot them." (8/9/2012 Tr., ECF No. 7-13, PageID.1444.)  This seems to, at the very least, give short shrift to the jury verdict acquitting Mercer of pre-meditated first-degree murder and conspiracy to commit the same.

concurring judgment)).  This analysis "compar[es] the gravity of the offense and the severity of the sentence." *Id.* at 60.  Mercer has not cited to any Supreme Court precedent clearly establishing that a life sentence is "grossly disproportionate" for a second-degree murder conviction.  Thus, the Court cannot grant her relief on this claim under AEDPA.

# VII

For the reasons stated above, the Court (1) **CONCLUDES** that Mercer is entitled to habeas relief on her claim that the trial court violate her due process rights when it refused to provide the Defense of Mercer instruction; (2) **ORDERS** counsel for the parties to appear for a video status conference (to be scheduled at a mutually-convenient time) to discuss the filing of supplemental briefs concerning the form and scope of habeas relief to be granted, and (3) **DENIES** Mercer's remaining claims for relief.

Before Mercer may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  When a court denies habeas relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner

satisfies this standard by demonstrating that [...] jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  When a court denies relief on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484-85.

This standard is met with respect to Mercer's claims pertaining to (1) trial counsel's initial reliance on the legally inapplicable defense of duress, (2) the prosecutor's closing remarks on the reliability of Mercer and Janish's statements to the police, and (3) the trial court's sentencing of Mercer based upon its conclusion that Mercer and Janish planned in advance to kill Thomas and Hannah.  The Court concludes that reasonable jurists could disagree with the Court's denial of relief on those two claims.  Accordingly, the Court **GRANTS** Mercer a certificate of appealability with respect to those two claims alone.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  April 25, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 25, 2022, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126